# 13-4480-cv

## United States Court of Appeals

*for the*

## Second Circuit

XUEDAN WANG, on behalf of herself and all others similarly situated,
ELIZABETH MANCINI, MATTHEW JORDAN WAGSTER, STEPHANIE
LAUREN SKORKA, ERIN E. SPENCER, ALEXANDRA RAPPAPORT,
SARAH WHEELS, CAITLIN LESZUK,

*Plaintiffs-Appellants,*

JESSICA ANN BEST, PAUL VANCE, COURTNEY HOLT,
JANET E. GLAZIER, REBECCA E. DIXON, ERIN D. SULLIVAN,
CARLY ROCKWELL, DANA LYNN VOGEL,

*Plaintiffs,*

– v. –

THE HEARST CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

RACHEL BIEN, ESQ.
ADAM T. KLEIN, ESQ.
JUNO TURNER, ESQ.
OUTTEN & GOLDEN LLP
*Attorneys for Plaintiffs-Appellants*
Three Park Avenue, 29th Floor
New York, New York 10016
(212) 245-1000

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ...................................................................2

STATEMENT OF THE ISSUES FOR REVIEW ..............................................3

STATEMENT OF THE CASE...........................................................................4

SUMMARY OF THE ARGUMENT .................................................................6

I.      The District Court Erred in Denying Summary Judgment to Plaintiffs...........7

II.     The District Court Erred in Denying Class Certification.................................9

STATEMENT OF FACTS ...............................................................................10

I.      Introduction ..........................................................................................10

II.     Plaintiffs...............................................................................................13

        A.      Xuedan "Diana" Wang..............................................................13

        B.      Elizabeth Mancini.....................................................................14

        C.      Alexandra Rappaport..................................................................15

        D.      Stephanie Skorka.......................................................................15

        E.      Erin Spencer .............................................................................16

        F.      Matthew Wagster .......................................................................17

        G.      Caitlin Leszuk...........................................................................18

        H.      Sarah Wheels.............................................................................19

III.   Interns at Hearst Perform Productive Work as Part of Hearst's Regular Operations, Receive Minimal Academic-Type Training, and Obtain the Same Benefits as Regular Employees ........................................................20

     A.   Interns Perform Productive Work that Benefits Hearst .....................20

     B.   Hearst Internships Do Not Provide Training that Is Comparable to Academic or Educational Training .................................................22

     C.   Interns Receive the Types of Benefits that Regular Employees Receive. .........................................................................................23

STANDARD OF REVIEW ..........................................................................23

ARGUMENT ...............................................................................................24

I.   The FLSA's Definition of "Employee" Is Necessarily Broad to Effectuate Its Remedial Purpose and Any Exceptions Are Narrowly Construed ..........24

     A.   *Portland Terminal*'s Exception for "Trainees" Is Narrow and Does Not Apply to Plaintiffs ...............................................................25

     B.   Under *Portland Terminal*, Individuals Who Provide an Immediate Advantage and Who Do Not Receive Educational Training Must Be Paid .......................................................................27

          1.   Under *Portland Terminal*, a Defendant Must Show that It Received No Immediate Advantage from the Plaintiffs' Work......................................................................28

              a.   Courts Consistently Hold that Individuals Who Do Productive Work, Like the Plaintiffs Did Here, Are Employees, Not Trainees........................................28

              b.   Congress Has Already Determined that Inexperienced Workers Who Provide Some Benefit to the Employer Must Be Paid..........................31

ii

2.    Under *Portland Terminal*, a Defendant Must Show that
the Plaintiffs Were Participants in an Educational or Vocational
Training Program ........................................................................32

II.    The District Court Improperly Adopted a Primary Beneficiary Test
That Is Not Supported by *Portland Terminal*.................................34

A.    The Sixth Circuit's Standard Is Inconsistent with
*Portland Terminal* and Should Not Be Followed ...............................34

B.    The Primary Beneficiary Test Is Unmanageable ................................35

C.    This Court Has Not Adopted the Primary Beneficiary Test ..............36

III.    This Court Should Adopt the Department of Labor's Six Criteria for
Unpaid Internships .......................................................................37

A.    The DOL Test Incorporates the Criteria that Were Essential
to the Supreme Court's Decision in *Portland Terminal* ....................37

1.    Requiring Each Criterion to Be Met Is More Consistent
with the FLSA's Broad Coverage than a Balancing Test.........39

2.    The DOL Test Invites Courts to Consider Additional
Circumstances Relevant to Employee Status...........................40

B.    The DOL's Experience and Consistent Approach in Trainee
and Intern Cases Warrant Deference to Its Intern Test......................41

IV.    The Court Should Grant Summary Judgment to Plaintiffs Because
the Undisputed Evidence Establishes that They Were Employees ..............43

A.    Plaintiffs Were Employees, Not Trainees, Under
*Portland Terminal* ........................................................................43

B.    Hearst Cannot Meet Four of the Six DOL Criteria as a
Matter of Law ...............................................................................46

1.    Plaintiffs Did Not Receive Training Similar to Training
Provided in an Educational Environment .................................46

2.     Hearst Did Not Design Plaintiffs' Internships to
Benefit Them..............................................................................49

3.     Plaintiffs Displaced Regular Employees and Were
Supervised Like Regular Employees ........................................50

    a.     The Evidence Establishes that Plaintiffs Displaced
Regular Employees ........................................................50

    b.     The Evidence Establishes that Plaintiffs Received
the Same or Less Supervision than Regular
Employees.....................................................................52

4.     Plaintiffs' Work Provided an Immediate Advantage to
Hearst and Did Not Impede its Operations ...............................53

C.     The DOL Criteria Decidedly Weigh in Plaintiffs' Favor ..................54

D.     Under Hearst's Primary Beneficiary Test, Hearst Benefitted
More than Plaintiffs.............................................................................55

V.     The District Court's Denial of Class Certification Should Be Vacated
and Reconsidered in Light of the Appropriate Legal Standard.....................56

A.     The District Court Erred in Concluding that Plaintiffs Failed to
Establish Commonality ....................................................................56

1.     Plaintiffs Are Not Required to Show that All Interns
Performed the Same Duties .......................................................56

2.     Plaintiffs Are Not Required to Show that All Interns Received
the Same Benefits......................................................................57

3.     The District Court Overlooked Common Evidence that
Hearst's Internships Were Not Similar to Training in an
Educational Environment...........................................................58

4.     This Case Is Not Similar to *Wal-Mart Stores v. Dukes* ............59

B.    The District Court Erred in Concluding that Plaintiffs Failed to Establish Predominance and Superiority ............................................60

      1.    Plaintiffs Raised Common Legal Issues that Predominate Over Any Individual Issues ......................................................60

      2.    Classwide Evidence Is Not Limited to Evidence Contained in Corporate-Level Documents ...............................61

      3.    *Comcast v. Behrend* Is Not a Bar to Predominance.................62

CONCLUSION .....................................................................................................63

# TABLE OF AUTHORITIES

CASES                                                       PAGE(S)

*Alladin v. Paramount Mgmt., LLC*,
   No. 12 Civ. 4309, 2013 WL 4526002 (S.D.N.Y. Aug. 27, 2013)......................43

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013)........................................................................................60

*Atkins v. Gen. Motors Corp.*,
   701 F.2d 1124 (5th Cir. 1983) ............................................................................42

*Archie v. Grand Central P'ship, Inc.*,
   997 F. Supp. 504 (S.D.N.Y. 1998) ...........................................................*passim*

*Bailey v. Pilots' Ass'n for the Bay & River Del.*,
   406 F. Supp. 1302 (E.D. Pa. 1976)....................................................................30

*Barrentine v. Arkansas-Best Freight Sys., Inc.*,
   450 U.S. 728 (1981)............................................................................................55

*Brock v. Superior Care, Inc.*,
   840 F.2d 1054 (2d Cir. 1988) ............................................................................36

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) .............................................................................63

*Comcast v. Behrend*,
   133 S. Ct. 1426 (2013)..............................................................................*passim*

*Danzer v. Norden Sys., Inc.*,
   151 F.3d 50 (2d Cir. 1998) ................................................................................54

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) .............................................................................63

*Dejesus v. HF Mgmt. Servs., LLC*,
   726 F.3d 85 (2d Cir. 2013) ................................................................................24

*Donovan v. American Airlines, Inc.*,
   686 F.2d 267 (5th Cir. 1982) .......................................................................32, 48

*Donovan v. New Floridian Hotel, Inc.*,
676 F.2d 468 (11th Cir. 1982) ............................................................................39

*Enea v. Bloomberg, L.P.*,
No. 12 Civ. 4656, 2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014) ......................62

*Glatt v. Fox Searchlight Pictures, Inc.*,
293 F.R.D. 516 (S.D.N.Y. 2013) ..............................................................*passim*

*Halvorson v. Auto-Owners Ins. Co.*,
718 F.3d 773 (8th Cir. 2013) ...............................................................................63

*Kaplan v. Code Blue Billing & Coding, Inc.*,
504 F. App'x 831 (11th Cir. 2013) ......................................................................42

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ...............................................................................63

*Marshall v. Baptist Hosp., Inc.*,
473 F. Supp. 465 (M.D. Tenn. 1979) ........................................................*passim*

*McLaughlin v. Ensley.*,
877 F.2d 1207 (4th Cir. 1989) ..................................................................*passim*

*Morgan v. Family Dollar Stores, Inc.*,
551 F.3d 1233 (11th Cir. 2008) ...........................................................................61

*Mullins v. City of New York*,
653 F.3d 104 (2d Cir. 2011) ................................................................................23

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) ................................................................................60

*Okoro v. Pyramid 4 Aegis*,
No. 11 Civ. 267, 2012 WL 1410025
(E.D. Wis. Apr. 23, 2012) ..........................................................................*passim*

*Parra v. Bashas', Inc.*,
291 F.R.D. 360 (D. Ariz. 2013) ..........................................................................62

*Reich v. Parker Fire Prot. Dist.*,
992 F.2d 1023 (10th Cir. 1993) .................................................................*passim*

vii

*Reich v. S. New England Telecomms. Corp.*,
892 F. Supp. 389 (D. Conn. 1995)......................................................61

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
659 F.3d 234 (2d Cir. 2011) ............................................................24

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944).................................................................*passim*

*Solis v. Laurelbrook Sanitarium & School, Inc.*,
642 F.3d 518 (6th Cir. 2011) .............................................34, 35, 51

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
471 U.S. 290 (1985)...................................................................43, 55

*Ulrich v. Alaska Airlines, Inc.*,
No. 07 Civ. 1215, 2009 WL 364056 (W.D. Wash. Feb. 9, 2009).....................42

*United States v. Mead Corp.*,
533 U.S. 218 (2001)..........................................................................41

*Velez v. Sanchez*,
693 F.3d 308 (2d Cir. 2012) .......................................................23, 36

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)...............................................................*passim*

*Walling v. Portland Terminal Co.*,
330 U.S. 148 (1947)..................................................................*passim*

*Wirtz v. Wardlaw*
339 F.2d 785 (4th Cir. 1964) ......................................................29, 55

*Zheng v. Liberty Apparel Co.*,
355 F.3d 61 (2d Cir. 2003) ...............................................24, 25, 36

**STATUTES**

28 U.S.C. § 1292(b) .............................................................................3, 6

28 U.S.C. § 1331 ....................................................................................2

28 U.S.C. § 1367....................................................................................2

29 U.S.C. § 203(d) ................................................................24

29 U.S.C. § 203(e)(1) ............................................................24

29 U.S.C. § 203(g) ............................................................1, 24

29 U.S.C. § 206(a) ................................................................61

29 U.S.C. § 214(a) ................................................................31

N.Y. Lab. Law § 651(5) ........................................................24

## REGULATIONS

29 C.F.R. § 520.300 ........................................................31, 40

29 C.F.R. § 520.408 ..............................................................31

29 C.F.R. § 778.107 ..............................................................61

## FEDERAL RULES

Fed. R. Civ. P. 56(c)(4) ........................................................54

Fed. R. Evid. 801(d)(2)(D) ..................................................16

## OPINION LETTERS

U.S. Dep't of Labor Op. Letter, 1975 WL 40999 (Oct. 7, 1975) ...........................42

U.S. Dep't of Labor Op. Letter, 1986 WL 1171074 (Jan. 17, 1986) ....................31

U.S. Dep't of Labor Op. Letter, 1994 WL 1004761 (Mar. 25, 1994) ..............30, 42

U.S. Dep't of Labor Op. Letter, 2004 WL 5303033 (May 17, 2004) ...................42

U.S. Dep't of Labor Op. Letter, No. FLSA2002-9,
2002 WL 32406599 (Oct. 7, 2002)..................................................31

## INTRODUCTION

The Fair Labor Standards Act ("FLSA"), the federal law that requires payment of minimum wages and overtime, protects all individuals whose work a company "suffer[s] or permit[s]." 29 U.S.C. § 203(g). Respondent The Hearst Corporation ("Hearst") "suffered" and "permitted" the work of thousands of interns between 2006 and the present, but did not pay them any wages for the many hours they worked. The Appellants, Xuedan Wang, Elizabeth Mancini, Alexandra Rappaport, Stephanie Skorka, Erin Spencer, Matthew Wagster, Caitlin Leszuk, and Sarah Wheels ("Plaintiffs"), are eight such interns to whom Hearst assigned productive work that benefited its operations on a day-to-day basis and whom it treated in all respects like regular employees – except that, unlike regular employees, it did not pay them. Their experiences are representative of interns across Hearst's magazines who performed productive work alongside Hearst's regular employees.

Hearst's defense that Plaintiffs were "trainees" who are not covered by the FLSA is precluded by the undisputed evidence. Under binding U.S. Supreme Court precedent and persuasive U.S. Department of Labor guidance, Hearst must prove that Plaintiffs' work provided it with "no immediate advantage," that it designed its internship program to benefit Plaintiffs, not its own operations, and that it provided Plaintiffs with educational training that is the same or similar to

training provided in an academic institution. Hearst's evidence fails to raise an issue of fact with respect to these requirements, and Plaintiffs' evidence establishes as a matter of law that none of them apply.

The district court's order denying Plaintiffs' summary judgment motion incorrectly applied *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), the Supreme Court case that defines the "trainee" exception, because it overlooked key aspects of the decision, adopted a "primary beneficiary" standard that *Portland Terminal* does not support, and expanded the trainee exception far beyond what the Supreme Court permitted, putting at risk the rights of all employees. This Court should reverse the district court's denial of summary judgment and enter judgment in favor of Plaintiffs.

Because the district court relied on an erroneous "trainee" standard to deny class certification and misapplied Rule 23 jurisprudence, this ruling should also be reversed and reconsidered in light of the correct legal standards.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the FLSA claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the New York Labor Law ("NYLL") claims under 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the U.S. Constitution.

2

This Court has appellate jurisdiction under 28 U.S.C. § 1292(b) and Rule 5(a) of the Federal Rules of Appellate Procedure.  On November 26, 2013, the Court granted Plaintiffs' petition for leave to appeal from an interlocutory order and ruled that this appeal and the appeal in *Glatt v. Fox Searchlight Pictures, Inc.*, No. 13-4478, would be heard in tandem.  Appendix ("A") 5662.

## STATEMENT OF THE ISSUES FOR REVIEW

1.    Whether the district court erred in holding that Hearst could establish its trainee defense even though the undisputed evidence showed that Plaintiffs performed work that provided it with an immediate advantage, displaced regular employees and other paid workers, and did not participate in a training program designed to benefit them or that provided training that was the same or similar to academic or educational training.

2.    Whether the district court erred in holding that *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), supports a balancing test under which a key consideration is whether the employer or the trainee is the primary beneficiary.

3.    Whether the district court erred in failing to require Hearst to establish that each of the U.S. Department of Labor's six criteria for unpaid internships was met in order to prevail on its trainee defense.

4.    Whether the district court's denial of class certification should be reversed because it evaluated Plaintiffs' claims against incorrect legal standards.

## STATEMENT OF THE CASE

Plaintiffs are eight unpaid interns who performed work for six of Hearst's magazines.  Their work, including running errands, packing and unpacking clothing, assisting at events, performing  administrative tasks, and providing editorial support, provided Hearst with an immediate advantage because it reduced the workloads of its regular employees and eliminated the need to hire other employees, temporary workers, and couriers to do the work that interns did. Although Hearst did not pay Plaintiffs, it treated them like regular employees in many other ways, including with respect to their supervision and work-related training.

On March 4, 2013, Plaintiffs moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and certification of a class of "unpaid interns at Hearst Magazines in New York," pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Special Appendix ("SPA") 1.  On May 8, 2013, the Honorable Harold Baer, Jr., District Court Judge for the Southern District of New York, denied the motions.  *Id*. at 1, 13.

The district court denied summary judgment on two grounds.  First, it held that the parties' dispute over which legal test should apply to determine whether Plaintiffs were employees under the FLSA, or "trainees" under *Portland Terminal*, itself "create[d] a genuine issue of fact sufficient to deny summary judgment."

4

SPA7.  Second, the district court held that *Portland Terminal* supported application of a balancing test under which "a key consideration" is "who is the primary recipient of benefits from the relationship."  SPA6.  The district court rejected Plaintiffs' argument that *Portland Terminal* did not endorse a primary beneficiary test and that it required Hearst to establish that Plaintiffs' work did not provide it with "an immediate advantage."  SPA5-6.  The district court then held that, under its trainee test, material issues of fact precluded summary judgment because the record showed "that there was *some* educational training, *some* benefit to individual interns, *some* supervision, and *some* impediment to Hearst's regular operations."  SPA7.

The district court denied Plaintiffs' class certification motion because it found that Plaintiffs had failed to satisfy the commonality requirement under Federal Rule of Civil Procedure 23(a)(2) and the predominance requirement under Rule 23(b)(3).  SPA8-12.  The district court held that commonality was not satisfied because the proposed class members had different duties and received different benefits from their internships.  SPA8-9.  In reaching this conclusion, the district court relied on its trainee test and certification decisions involving FLSA duties-based exemptions, and rejected Plaintiffs' argument that the correct test considers the nature of interns' work – whether it provides an "immediate advantage" – and not the specific duties interns perform.  *See* SPA9-11.  It also

5

rejected Plaintiffs' argument that any differences in the benefits that interns received were immaterial to the merits because they were all benefits that regular employees might receive and not benefits stemming from academic or educational training. *See id.* The district court also held that *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), precluded a finding of commonality because, although Plaintiffs had raised several common questions, differences in duties and benefits would result in different answers to those questions for class members. SPA9.

The district court held that predominance and superiority were not met because Plaintiffs had failed to satisfy commonality, because the evidence on which Plaintiffs intended to rely to prove the merits was primarily found in intern and intern supervisor testimony and other non-corporate-level documents, and because it held that *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), precluded certification where the amount of damages owed to individual class members varied. SPA10-13.

On May 29, 2013, Plaintiffs timely moved for certification of the district court's order for immediate appeal pursuant to 28 U.S.C. § 1292(b). Dkt. No. 150. The district court granted Plaintiffs' motion on June 27, 2013. A5612-15.

## SUMMARY OF THE ARGUMENT

The FLSA's broad definition of "employee" covers Plaintiffs because Hearst "suffered" and "permitted" their work, which was done on its premises and

6

benefitted its magazines' operations.  Hearst failed to raise questions of fact sufficient to show that Plaintiffs were not employees because they fell under the Supreme Court's narrow exception for trainees in *Portland Terminal*.  Undisputed evidence establishes that Plaintiffs' work provided Hearst with an immediate advantage, that their internships were not designed to benefit them and, in fact, benefited Hearst, and that they were not participants in a training course under *Portland Terminal* and subsequent cases.

## I.    The District Court Erred in Denying Summary Judgment to Plaintiffs.

In denying summary judgment to Plaintiffs, the district court made the following legal errors:

First, the district court failed to require Hearst to show that Plaintiffs' productive work provided it with "no 'immediate advantage,'" *Portland Terminal*, 330 U.S. at 153, which Hearst could not do.  This finding was crucial to the Supreme Court's holding in *Portland Terminal* that the railroad trainees were not employees under the FLSA.  *See id*.

Second, the district court failed to require Hearst to show that its internship program provided training that was the same or even similar to training that is provided in an educational environment, which Hearst could not do in any event.  In *Portland Terminal*, the railroads offered "the same kind of instruction" as a school.  *Id*. at 152-53.  A necessary prerequisite to the application of the trainee

7

exception is evidence of a *bona fide* training program like the one in *Portland Terminal*. Where, as here, employees "merely . . . supervis[e] trainees as they carry out employees' duties," this prerequisite is not met. *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1028 (10th Cir. 1993).

Third, the district court erroneously held that *Portland Terminal* endorsed a balancing test under which it evaluated whether the employer or the trainees was the primary beneficiary of the relationship. The Supreme Court did not weigh the benefits the trainees received against the benefits the railroads received. It explicitly relied on findings that the training program served "*only*" the trainees' "own interest" and that the railroads received "no 'immediate advantage' from any work done by the trainees." *Portland Terminal*, 330 U.S. at 152-53.

Finally, in applying its primary beneficiary test, the district court incorrectly concluded that material issues of fact precluded a grant of summary judgment to Plaintiffs. Undisputed evidence established that Hearst could not satisfy the first, second, third, and fourth DOL criteria. Even under a primary beneficiary test, Hearst was the primary beneficiary of the relationship.

This Court should not adopt the primary beneficiary test because it is not supported by *Portland Terminal* and is unpredictable, subjective, and hard to apply. The Court should adopt the U.S. Department of Labor's ("DOL's") six criteria for unpaid internships, which are set forth in U.S. Department of Labor

8

Fact Sheet No. 71. The criteria match the circumstances that were essential in *Portland Terminal*, align with the FLSA's broad definition of "employee," and merit deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

## II.   The District Court Erred in Denying Class Certification.

The district court's denial of class certification should be reversed and remanded because it relied on an incorrect legal standard and misapplied Rule 23 jurisprudence:

First, the district court incorrectly held that Plaintiffs failed to satisfy Rule 23(a)(2)'s commonality requirement. The district court disregarded substantial evidence showing that, across the board, interns performed productive work that benefited Hearst, received the types of benefits that result from a work relationship, and did not receive training that was similar to that offered in an educational environment. This evidence will answer decisive merits questions and satisfies Plaintiffs' commonality showing.

It is the nature of interns' work – whether it provides an immediate advantage – and not interns' specific duties that is relevant. The differences in the particular benefits interns received were also not material because they were all benefits that regular employees receive and not benefits stemming from academic or educational training, which *Portland Terminal* and the DOL criteria require.

9

Second, the district court incorrectly held that Plaintiffs failed to satisfy Rule 23(b)(3)'s predominance requirement. The district court held that common issues did not predominate because, as it ruled, there were no common issues. It also held that Plaintiffs could not meet the predominance requirement because the evidence on which Plaintiffs intended to rely to prove the merits was primarily found in intern and intern supervisor testimony and other non-corporate-level documents, and because *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), precludes certification where the amount of damages owed to individual class members varies.

## STATEMENT OF FACTS

### I.    Introduction

Plaintiffs are eight unpaid interns who performed work that benefited Hearst, including unpacking and packing clothing, accessories, and beauty products; going on errands; staffing events; and doing other support work. A3348 (¶164); A3358-59 (¶222); A3360 (¶228); A3362 (¶242); A3363 (¶244); A3371-72 (¶¶280-81); A3375 (¶299); A3376 (¶305); A3377 (¶¶306-10); A3380 (¶¶322-23); A3385 (¶348); A3387 (¶358). Hearst classified Plaintiffs and all other interns as non-employees and treated them as exempt from all minimum wage protections. A3311 (¶15). Since at least 2006, Hearst has hired at least 3,000 interns to do low-level work at most of its 20 magazines and certain corporate departments

throughout the year.  *See* A3309 (¶5); A3311 (¶17); A3329 (¶73); A3075-82; A3086-158.

Plaintiffs and other unpaid interns save Hearst money by performing work that other Hearst employees, temporary workers, or other workers, like couriers, would otherwise perform.  *See* A3337 (¶110); A3346-47 (¶¶157, 159-60).  For example, Wang's supervisor at Harper's Bazaar ("Bazaar") admitted that, during times when interns are not available, he and his co-workers must do interns' work or he hires paid temporary workers to do it.  A3347 (¶159).  Other Hearst employees also admitted, and Hearst's job descriptions show, that interns throughout its organization do much of the same work as paid employees and temporary workers.  *See* A137, 184-85 (23:5-24; 85:22-86:8); A535-36 (37:18-38:5); A4759-61 (119:18-121:2); A1003 (82:22-83:3); A1811-12, 1816-17 (12:25-13:8; 18:2-19:19); A1988, 2015-16 (115:7-10; 171:18-172:11); A2944-51 (fashion assistant job postings); A3125-28 (fashion intern job postings); A2529 (¶2); A1449 (84:13-23); A1720-23 (209:6-210:5; 211:23-212:3); A2941-42 (beauty assistant job posting); A3076, A3100, A3106, A3115 (beauty intern job postings); A600-02, 612 (6:22-8:12; 22:19-21); A1879-80 (9:2-10:22); A3079; A3137-39; A3145 (editorial intern job postings); A3234-59 (editorial assistant job postings); A2916-21 (photo assistant job postings); A3102, 3134, 3141-43 (photo intern job postings); A90-91 (58:12-59:7); A1081, 1113 (48:20-23; 142:10-23); A2144-45

11

(76:2-77:17); A2842-45; A2907-14, 2923-39 (sales assistant job postings); A3153; A5419 (sales intern job postings).

In a 2008 memo, the Executive Managing Editor of Bazaar instructed employees to cut down on messenger costs, including by "us[ing] your interns to do Manhattan runs (using the subway)." A2211. She also told employees who did not already use interns for runs to request them. *Id.* Likewise, in 2011, the Managing Editor of Marie Claire told Hearst's Human Resources Department that she wanted to hire 57 interns because the magazine "used interns to pick up and deliver merch [sic] to reduce our messenger costs." A2208; A1269.

Interns allow Hearst employees to "devote" time "to other tasks," provide much needed "help" when employees are shorthanded, enable Hearst's departments to "run smoothly," and make Hearst's employees' lives "so much easier." A167 (56:8-12); A183 (84:8-20); A233-34 (125:8-126:6); A366 (24:24-25:6); A568 (101:2-4); A1183 (142:9-20); A1832 (34:13-18); A2340. Hearst employees "constantly ask[] for interns to help because they are so busy." A1832 (34:13-18). Hearst admits that, even since this lawsuit was filed, it has not taken any steps to ensure that it does not benefit from interns' work. A3319 (¶36).

12

## II.    Plaintiffs

### A.    Xuedan "Diana" Wang

Xuedan "Diana" Wang was an intern at Bazaar from August 2011 to December 2011.  A3309 (¶7); A3311 (¶17); A3348 (¶164).  She typically worked 5 days a week from 9 a.m. to 8 p.m. or later.  A3354 (¶¶198-199).  Wang supervised six to eight other interns who worked with her in Bazaar's "fashion closet," where clothing and accessories are stored.  A3348 (¶165).  On her first day, Wang was trained by another intern.  A3355 (¶202).

Wang's supervisor assigned her to the role of "head intern."  A3345 (¶153). As the head intern, Wang served as a contact between editors and public relations representatives, coordinated the pick-up and delivery of accessories, and did her supervisor's expenses.  A3344 (¶144); A3348 (¶¶164-65); A3352 (¶184); A3353 (¶¶190-91).  When Wang was demoted from the head intern role, a paid temporary worker took over.  A3357 (¶214).

Wang and the interns she supervised packed and unpacked samples, maintained the accessories closet, went on errands to pick up and return samples, did photo research, and assisted at photo shoots.  A3357 (¶213); A3348 (¶166); A3349 (¶172); A3350 (¶¶175-76); A3351 (¶181); A3352 (¶187).  These tasks would have been performed by paid workers if interns did not perform them. A3346-47 (¶¶156-57, 159-60); A3352 (¶187); A3357 (¶214).  Wang learned her

13

duties from the intern who trained her and by doing the work on the job. A3355 (¶¶202-03, 205). Wang testified that she mostly interacted with her supervisors via email and provided status reports. A2029-30 (248:24-249:6); A3356 (¶¶206-07).[1]

Wang reported to Sam Broekema, Bazaar's Senior Accessories editor. A3340 (¶¶119, 122). Broekema believes that interns are vital to keeping Bazaar's operations running smoothly. A3340 (¶124); A3350 (¶177). Broekema delegated some of the work that he typically did to the head intern so that he could focus on different responsibilities. A3343 (¶140). During periods between semesters when the Accessories Department did not have interns, Broekema and other editors did the work that interns performed, requiring them to work "much longer" hours, or they hired a temporary Assistant to do the work. A3347 (¶¶159-60).

### B.    Elizabeth Mancini

Elizabeth Mancini was an intern at Marie Claire from January 2009 to June 2009. A3310 (¶9). She typically worked 3 to 4 days a week from 8:30 or 9 a.m. to around 8 p.m. A3369-70 (¶¶270-72). Mancini worked in Marie Claire's fashion closet with 20 to 30 other interns. A3362 (¶240). Her duties involved receiving, unpacking, repacking, checking in, and putting away clothing. *Id.* (¶¶242-43). These tasks made it easier for Hearst employees to pick out clothes for the magazine. A3363 (¶245).

---

[1]    Hearst's evidence shows that Wang's supervisor, Sam Broekema, met with her in person approximately eight times. *See* A3356 (¶206); A2197 (¶14).

Mancini's supervisor checked in on her periodically to see if she had completed her assignments correctly. A3367 (¶260).[2]  Mancini did not receive formal training during her internship and any learning she did was on the job. A3367 (¶259).

### C.    Alexandra Rappaport

Alexandra Rappaport was an intern at Seventeen from May 2011 to July 2011. A3310 (¶13); A3383 (¶338). She typically worked 4 days a week from 9:30 a.m. to 6:30 or 7:30 p.m. A3386 (¶351). Rappaport worked in Seventeen's fashion closet organizing clothing and jewelry, hanging them on racks, packing them up, running errands, and other administrative work. A3385 (¶348). These tasks were also performed by paid Hearst assistants. A3385 (¶349).

Rappaport spoke to her supervisors about once a day and was emailed assignments. A3384 (¶344-45). On her first day, other fashion interns showed her how to perform her duties. A3385 (¶347).

### D.    Stephanie Skorka

Stephanie Skorka was an intern at Redbook from September 2009 to December 2009. A3310 (¶11); A3370-71 (¶¶275-77). She typically worked 3 days a week from 10 a.m. to 6 or 7 p.m. A3373 (¶290). Skorka managed

---

[2]    Although Hearst asserted that Mancini received regular feedback, A3367 (¶260), her supervisor told her she was "doing a good job" and "was happy with [Mancini's] performance." A4774-75 (155:19-156:3).

15

Redbook's "beauty closet," where beauty products are stored, by replacing old products with new ones and organizing products, assisted at photo shoots, pitched and wrote beauty stories, attended beauty product launches, and contacted firms about products to feature in the magazine.  A3371-72 (¶¶280-82).  Paid Hearst assistants also do some of these tasks.  A3373 (¶286).

Skorka's supervisors told her she was doing the work of a paid assistant and tried to hire her as a paid consultant after her internship ended, but Redbook did not have the budget.  A3373 (¶¶285-88).[3]  During her internship, Skorka did not participate in any formal training.  A3375 (¶297).  She learned how to perform her tasks and received some feedback on her work and career advice from her supervisors.  *See* A5505-08 (¶¶D107-122).

### E.    Erin Spencer

Erin Spencer was an intern at Cosmopolitan ("Cosmo") from June 2010 to August 2010.  A3309 (¶8).  She typically worked 4 days a week from 9 a.m. to 5 or 5:30 p.m.  A3360 (¶231).  The Hearst employee who interviewed her asked her whether she had experience with organizing because organizing and administrative tasks would be an important part of her role.  A3358 (¶219).  Spencer's duties included organizing files, selecting models to attend casting calls, holding casting

---

[3]    These statements are not hearsay because they were made by Hearst's employees during the course of their employment.  *See* Fed. R. Evid. 801(d)(2)(D).

16

calls, assisting at photo shoots, running errands, doing mailings, updating contact lists, and assisting in the fashion closet.  A3358-59 (¶¶222-24, 226).

The training that Spencer received was primarily on-the-job training. A3360-61 (¶232).[4]  She also attended four one-hour sessions of "Cosmo-U," at which Cosmo editors talked about how they got their jobs.  A3360-61 (¶232). Spencer checked in with her supervisors once or twice a day.  A3360 (¶229).

### F.    Matthew Wagster

Matthew Wagster was an intern at Esquire from July 2009 to December 2009.  A3310 (¶10).  He typically worked 3 days a week, from 9 a.m. to 6 p.m. or later.  A3378 (¶314).  The Hearst employees who interviewed Wagster asked him about his experience doing administrative work because the internship would involve that type of work.  A3375 (¶299).

Wagster ran errands, did expenses for magazine staff, updated guest lists, helped prepare for events, and worked at events.  A3376-77 (¶¶305-10).  Some of the duties that Wagster performed were also performed by paid Hearst employees. A3378 (¶312).

---

[4]    Hearst argued that Spencer received "extensive additional training," A3361-62 (¶232), however, the evidence shows that Spencer learned by doing work on the job.  *See id*.

Wagster did not receive any formal training and was taught how to perform his administrative duties.  A3378 (¶313).  He was not closely supervised.  A3376 (¶304).[5]

## G.    Caitlin Leszuk

Caitlin Leszuk was an intern at Marie Claire from January 2010 to May 2010.  A3310 (¶12).  She typically worked 4 days a week from 9 a.m. to 6 p.m.  A3382 (¶330).  Leszuk created "edit credit" spreadsheets, which involved reviewing Marie Claire and its competitors' magazines and entering the page, article, and other information about particular brands into a spreadsheet, and "edit credit books."  A3380 (¶¶322-24); A3381 (¶326); A3382 (¶328).  Paid employees also performed these tasks.  A3381 (¶¶325, 327-28).

Leszuk interacted with her supervisors approximately twice a day.  A3380 (¶321).  She learned on the job and attended one "Media Math" session.  A3379-80 (¶¶318-21); A4630-31 (86:22-87:3); A4698-99 (226:21-227:9); A5479 (¶12); A5485 (¶D30).[6]

---

[5]    Hearst attempted to rebut this fact with other testimony from Wagster, but the testimony shows his supervision was minimal.  A3376 (¶304); A1956 (108:17-24) (preparing guest lists was not difficult because of experience using Excel); A1957-58 (101:8-12) (supervisor told him how to fix a mistake and that he did a good job).

[6]    Hearst attempted to rebut this fact based on an e-mail in which Leszuk said she attended weekly classes, *see* A3379 (¶319), but Leszuk explained that the e-

### H.    Sarah Wheels

Sarah Wheels was an intern at Cosmo from May 2011 to August 2011. A3311 (¶14); A3386-87 (¶¶355-56).  She typically worked 4 days a week from 9:15 a.m. to 6 p.m.  A3389 (¶365).  Wheels responded to readers' emails, researched, surveyed people on the street, transcribed interviews, compiled sales statistics, located archived articles, wrote magazine content, and fact-checked. A3387 (¶358).  Many of these tasks are also performed by paid editorial assistants. A3388 (¶360).  Wheels took over some of the responsibilities of an editorial assistant who resigned.  A3388 (¶359); A2086-88 (137:8-15, 138:18-139:19); A2094-95 (145:9-146:19).

Wheels received minimal supervision.  She was generally asked to do tasks and then expected to do them.   A3387 (¶357).[7]  Wheels attended four, one-hour sessions of "Cosmo U," where employees discussed Cosmo's departments and their career paths.  A3389 (¶363).

---

mail was not accurate because she only attended one class.  *See* A4701 (229:2-230:2).

[7]     Hearst's evidence supports this fact.  *See* A3387 (¶357), A5287 (noting that supervisor was "hands-off," and that she wanted more feedback and guidelines).

### III.   Interns at Hearst Perform Productive Work as Part of Hearst's Regular Operations, Receive Minimal Academic-Type Training, and Obtain the Same Benefits as Regular Employees.

The testimony of dozens of interns and Hearst employees, Hearst's intern job descriptions, and other internal documents consistently show that interns at Hearst performed productive work as part of Hearst's operations, did not receive training equivalent to that which is provided in an educational environment, and received the types of benefits that regular employees receive.

### A.   Interns Perform Productive Work that Benefits Hearst.

Across its magazines and departments, Hearst hired interns to perform productive work that benefitted it.  For example, like Wang, Mancini, and Rappaport, interns who worked in the fashion and accessories departments of Hearst's magazines spent most of their time in the "closet," organizing clothing and accessories; hanging them on racks; and packing them up for photo shoots and to be returned to vendors.  A137-38, 145-46 (23:18-24; 24:15-25; 31:11-32:6); A4759-61 (119:18-121:2); A1816-17 (18:2-19:19); A1988 (115:7-10); A2822; A2862-65; A2829-35; A2382-83; A3011-12; A3087; A3117; A3126; A3128; A3151.

Similarly, like Skorka, interns in Hearst's beauty departments managed and organized the beauty closet, requested products from vendors, and unpacked products when they arrived.  A363-64, 373 (21:20-22:19; 31:15-20); A1167 (93:7-

20

94:13); A1427 (36:16-18); A1476, 1479-80 (30:18-20; 33:21-35:8); A1676-77 (108:14-109:5); A2295-300; A2468 (¶6); A2650 (¶6).

Like Wheels, interns in Hearst's editorial departments transcribed interviews, did research, fact-checked articles, collected press clippings, pitched and drafted content for the magazines and their blogs, and performed administrative work.  A381-82 (39:6-12; 40:11-24); A2214; A444-46, 449-50, 452-53, 458 (60:12-62:18; 65:22-66:4; 68:14-69:3; 75:8-16); A2224-25; A626, 632 (50:6-12; 62:1-8); A2661 (¶5); A1363-34 (43:14-44:19); A1393-94 (71:15-72:10); A1884-85 (23:24-24:11); A2978-81; A2968-96; A2507 (¶5); A2568-69 (¶5); A2609 (¶5); A2730 (¶10); A3079; A3137; A3139; A3120.

Like Leszuk, interns in Hearst's sales departments compiled "edit credits." A97 (81:13-23); A219, 222, 225 (77:17-25; 80:18-23; 83:4-20; A494 (42:14-24); A579-80, A583 (92:15-93:21; 96:8-96:11); A683-84 (89:23-90:13); A739-41 (134:12-136:8); A746-52 (27:24-33:13); A1067 (59:3-8); A1081 (48:20-23); A2278-86; A1583-84 (56:17-57:21); A1620-21 (49:17-50:3); A1803-04 (46:22-47:19); A2907-09; A3153.

Like Wagster, interns in Hearst's marketing departments assisted with promotional events.  A235 (127:3-9); A3180-81 (30:24-31:18); A1603-04 (114:24-115:18); A1900-01, 1908-09 (20:22-21:17; 37:19-38:15); A1951 (103:4-9); A2512 (¶5); A2582 (¶9); A3098.

21

**B.      Hearst Internships Do Not Provide Training that Is Comparable to Academic or Educational Training.**

Interns at Hearst received little or no academic or educational training and their internships were structured around Hearst's actual operations.  A281-82 (63:11-64:17); A462 (95:3-7); A683 (89:5-8); A805-06 (226:21-227:9); A865 (39:13-19); A1037-38 (130:10-131:10); A1149 (61:15-18); A1375 (86:12-87:4); A1419-20 (110:8-11:19); A1460 (109:14-17); A1475 (29:4-11); A1753-54 (107:25-108:13); A1956 (108:12-21).  Hearst does not have any policies, and has not taken any steps, to ensure that its internships are structured around a classroom or academic experience.  A562-63 (89:25-90:10); A1211 (72:13-21).  Hearst's magazines do not budget any money specifically for intern trainings or for time spent on interns.  A3312 (¶19).

Like entry-level employees at Hearst, A1336-37 (163:19-164:5), the training that interns receive is primarily on-the-job training.  A230 (120:6-13); A285-87 (67:23-69:11); A420 (90:13-91:5); A462, 469 (95:8-25; 114:21-24); A824-25 (310:20-311:8); A1049 (166:20-21); A1185 (144:21-145:17); A1371-72 (80:4-81:14); A1682, 1708-09 (114:16-23; 174:20-175:15); A1852 (25:5-13); A1956 (108:12-21); A2026 (237:16-24).

## C.   Interns Receive the Types of Benefits that Regular Employees Receive.

Hearst interns received very similar benefits: office skills, professionalism and office etiquette, knowledge of the magazine industry, contacts, career advice, and job references.  A5480 (¶D14); A5490-91 (¶¶D49, D53); A5492 (¶D57), A5500-01 (¶¶D87, D89); A5507-08 (¶¶D118, D120-21); A5511 (¶¶D134-35); A5515-16 (¶D150); A5518-19 (¶¶D161, D164); A5520 (¶D168); A5523-24 (¶¶D178, D182-83); A5539 (¶D235); A5543 (¶D249); A2450 (¶8); A2456 (¶9); A2514 (¶8); A2525 (¶8); A2549-50 (¶¶8, 10); A2555 (¶10); A2564 (¶7); A2621 (¶¶9, 11); A2651-52 (¶10); A2691 (¶10); A2444-45 (¶6); A2469 (¶9); A5279 (¶10); A2615 (¶7); A3706 (¶10); A2696-97 (¶8); A2717-18 (¶¶8, 10); A3874 (¶6); A2753-54 (¶5); A2531 (¶8); A2696-97 (¶8); A3875 (¶8); A3881 (¶11); A5266 (¶11); A2771 (¶7).

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's denial of summary judgment. *Mullins v. City of New York*, 653 F.3d 104, 113 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1744 (2012).  Whether an individual is an "employee" under the FLSA is a question of law subject to *de novo* review.  *See Velez v. Sanchez*, 693 F.3d 308, 313-14 (2d Cir. 2012); *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1025 (10th Cir. 1993).

23

This Court reviews *de novo* "the conclusions of law that informed the [district court]'s decision to deny class certification" under Rule 23 of the Federal Rules of Civil Procedure. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011).

## **ARGUMENT**

### I.     **The FLSA's Definition of "Employee" Is Necessarily Broad to Effectuate Its Remedial Purpose and Any Exceptions Are Narrowly Construed.**

Congress defined the term "employee" in the FLSA with "striking breadth," to extend its protections to "many persons and working relationships" not previously protected by any labor law. *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 91 (2d Cir. 2013) *cert. denied*, 134 S. Ct. 918 (2014) (internal quotation marks and citation omitted).  An "employee" is "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  To "employ" is "to suffer or permit to work."[8]  29 U.S.C. § 203(g).

An employer "'suffers or permits' an individual to work if, as a matter of 'economic reality,' the entity functions as the individual's employer."  *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (citation omitted).  The

---

[8]     The New York Labor Law's definition of employee is nearly identical to the FLSA's definition.  *See* N.Y. Lab. Law § 651(5); *Glatt v. Fox Searchlight Pictures, Inc.*, 293 F.R.D. 516, 532 (S.D.N.Y. 2013).

"overarching concern is whether the alleged employer possessed the power to control the workers in question." *Id.* (internal quotation marks and citation omitted).  The economic reality factors include whether the employer: (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Id.* at 67.

In this case, there is no dispute that Hearst "possessed the power to control" Plaintiffs and its other interns. *See id.* at 66.  Hearst employees hired Plaintiffs, supervised them and assigned them work, determined that they would not be paid, and maintained their records. *See* A3311 (¶15); A3324 (¶54); A3340 (¶122); A3345 (¶153); A3357 (¶216); A3358 (¶221); A3360 (¶229); A3361 (¶235); A3362 (¶239); A3370-71 (¶¶275-78); A3375-76 (¶¶298-30, 303); A3379 (¶316); A3380 (¶¶320-21); A3383-84 (¶¶338-44); A3386-87 (¶¶355-57).  Instead, Hearst claims that Plaintiffs were "trainees" whom it was not required to pay under the Supreme Court's decision in *Portland Terminal*.  As discussed below, Hearst cannot prove its defense because *Portland Terminal*'s trainee exception does not apply to Plaintiffs.

### A. *Portland Terminal*'s Exception for "Trainees" Is Narrow and Does Not Apply to Plaintiffs.

*Portland Terminal* established a narrow exception to the FLSA's broad coverage for participants in a *bona fide* training program that does not apply to

25

Plaintiffs.  In that case, railroads offered a weeklong training course to applicants seeking to become railroad brakemen.  330 U.S. at 149.  The trainees learned by observing regular employees and then "gradually" did some actual work "under close scrutiny."  *Id.*  The trainees' activities did not displace the regular employees, who "d[id] most of the work themselves" and were required to "stand immediately by to supervise whatever the trainees d[id]."  *Id.* at 149-50.  The trainees' work did not "expedite the company business," but instead sometimes "impede[d] and retard[ed]" it.  *Id.* at 150.  After completing the training successfully, the trainees were included on the company's list of potential brakemen and retroactively paid for the training period.  *Id.*

The Supreme Court relied on certain key facts to hold that the trainees were not employees.  First, the trainees did not provide "any 'immediate advantage'" to the railroads.  *Id.* at 153.  Second, the company provided "the same kind of instruction" as a vocational school.  *Id.*  Third, the trainees worked "solely" for their own "personal purpose or pleasure" and thus were like students in school, except that they trained on an employer's premises.  *Id.* at 152.  Fourth, the trainees did not displace any regular employees and actually impeded their work.  *Id.* at 149-50.

Acknowledging the concern that a decision in favor of the railroads might "open up a way for evasion of the law," *id.* at 153, the Supreme Court emphasized

26

the narrow scope of its ruling. Critically, it noted that this was not a case where the "employer had evasively accepted the services of beginners" for less than the minimum wage. *Id.* Rather, "the unchallenged findings" were that the railroads "receive[d] *no* 'immediate advantage' from *any work* done by the trainees." *Id.* (emphasis added).

*Portland Terminal*'s narrow ruling does not apply to Plaintiffs because they did provide an immediate advantage to Hearst. *See* Part IV, *infra*. In denying summary judgment to Plaintiffs, the district court expanded the *Portland Terminal* trainee exception beyond the circumstances that were essential to the ruling that created it. Under the district court's test, which Hearst urged, a private employer may hire interns to perform productive work without pay as long as the interns obtain "*some* benefit" from the experience, even generic skills learned on the job. *See* SPA7. The district court's test is inconsistent with *Portland Terminal*, subsequent decisions, and the FLSA's broad coverage.

> ### B.     Under *Portland Terminal*, Individuals Who Provide an Immediate Advantage and Who Do Not Receive Educational Training Must Be Paid.

The district court erred by failing to require Hearst to make two essential showings that *Portland Terminal* requires: that Hearst did not receive an immediate advantage from Plaintiffs' work and that Hearst's internship program provided the same training as an educational program. *See* 330 U.S. at 150-53.

27

Ignoring the FLSA's broad coverage of employees and the Supreme Court's careful delineation of a narrow trainee exception in *Portland Terminal*, the district court created a broad exception that sweeps in many workers whom the FLSA was designed to protect.

### 1. Under *Portland Terminal*, a Defendant Must Show that It Received No Immediate Advantage from the Plaintiffs' Work.

The district court incorrectly held that Hearst could prevail on its trainee defense notwithstanding the undisputed evidence that Plaintiffs regularly performed productive work for its magazines. *See* SPA2-7. However, the fact that the trainees provided the railroads with "no 'immediate advantage'" was crucial to the Supreme Court's decision that they were not employees. *See Portland Terminal*, 330 U.S. at 153 ("Accepting the unchallenged findings here that the railroads receive 'no immediate advantage' from any work done by the trainees, we hold that they are not employees within the Act's meaning.") Hearst was required to prove that Plaintiffs' work did not provide it with any immediate advantage. *See id*. Hearst failed to even raise a factual dispute.

### a. Courts Consistently Hold that Individuals Who Do Productive Work, Like the Plaintiffs Did Here, Are Employees, Not Trainees.

Courts following *Portland Terminal* have consistently held that plaintiffs who perform the types of productive tasks that Plaintiffs regularly performed for

Hearst, which the district court described in detail, *see* SPA2-3, provide an immediate advantage to their employers and are not trainees.

For example, in *Wirtz v. Wardlaw*, the Fourth Circuit held that high school students who performed clerical tasks in an insurance salesman's office were employees, not trainees.  339 F.2d 785, 786, 788 (4th Cir. 1964).  The Fourth Circuit relied on the fact that the students' work benefited the defendant because it furthered the company's promotional activities.  *Id.* at 787-88.

In *McLaughlin v. Ensley*, a snack food distribution company required prospective drivers to participate in a short-term training program to become familiar with the duties they would perform if they were hired.  877 F.2d 1207, 1208 (4th Cir. 1989).  The prospective drivers helped current drivers perform their duties.  *Id.* at 1210.  The Fourth Circuit held that the prospective drivers were employees and not trainees under *Portland Terminal* because their work benefitted the employer by aiding his employees and allowing him to evaluate the prospective drivers' work.  *Id.* at 1209-10.

In *Glatt*, the interns performed administrative and clerical work.  293 F.R.D. at 533.  The court held that this work provided the defendant with an immediate advantage because it was work that "would have required paid employees," even if it was "menial" and regardless of "'whether . . . someone else could have

performed the duties better or in less time.'"  *Id.* (quoting *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 n.3 (11th Cir. 1982)).

In *Archie v. Grand Central Partnership, Inc.*, the plaintiffs performed maintenance, outreach, food preparation, and clerical work for the defendants' homeless outreach programs.  997 F. Supp. 504, 533-35 (S.D.N.Y. 1998) (Sotomayor, J.).  The court held that the plaintiffs were employees and not trainees because their work provided the defendants with an immediate advantage by allowing them to pay less than the minimum wage for the types of services that their competitors compensated at full rates.  *See id.* at 533.[9]

The DOL has also found that individuals who performed productive tasks for an employer's operations were employees because their work provided an immediate advantage to the employer.  For example, the DOL opined that interns who assisted in the daily operations of a youth hostel were employees and not trainees.  U.S. Dep't of Labor Op. Letter, 1994 WL 1004761, at *2 (Mar. 25, 1994).  Similarly, the DOL advised a grocery store that students who volunteered to bag groceries to raise money for charity were employees because their work provided an economic benefit to the store and reduced the workloads of regular

---

[9]    *See also Okoro v. Pyramid 4 Aegis*, No. 11 Civ. 267, 2012 WL 1410025, at *10 (E.D. Wis. Apr. 23, 2012) (work cleaning, picking up prescriptions, appearing in court, and relaying payroll information "conferred an immediate benefit to the company"); *Bailey v. Pilots' Ass'n for the Bay & River Del.*, 406 F. Supp. 1302, 1305, 1307 (E.D. Pa. 1976) (apprentice river boat driver who performed the duties of a regular crew member was an employee).

employees.  U.S. Dep't of Labor Op. Letter, No. FLSA2002-9, 2002 WL

32406599, at *3 (Oct. 7, 2002); *see also* U.S. Dep't of Labor Op. Letter, 1986 WL

1171074, at *2-3 (Jan. 17, 1986).

> **b.    Congress Has Already Determined that Inexperienced Workers Who Provide Some Benefit to the Employer Must Be Paid.**

Even certain workers who provide work *of little or no value* for an employer

must still be paid 95% of the minimum wage.  Under the FLSA, an employer can

apply to the DOL's Wage and Hour Administrator to pay a reduced minimum

wage to "learners," who are "being trained for an occupation, which is not

customarily recognized as an apprenticeable trade, for which skill, dexterity and

judgment must be learned and who, when initially employed produce[] little or

nothing of value."  29 C.F.R. § 520.300; *see* 29 U.S.C. § 214(a); 29 C.F.R. §

520.408.  Congress's decision to require even *bona fide* "learners" to be paid 95%

of the minimum wage supports the argument that Plaintiffs, who are not "learners,"

must be paid for their work.

In fact, in *Portland Terminal*, the Supreme Court distinguished the trainees

from "learners" because the trainees provided no benefit to the railroads.  *See* 330

U.S. at 151, 153-54.  The railroads had not "accepted the services of beginners,"

because the trainees provided no services at all.  *Id.* at 150, 152-53.  Here, Hearst

has done what the Supreme Court held would have violated the FLSA – it

31

"accepted the services of beginners" without paying them the minimum wage or obtaining permission to pay them a reduced minimum wage. *See id.* at 153.

> **2.    Under *Portland Terminal*, a Defendant Must Show that the Plaintiffs Were Participants in an Educational or Vocational Training Program.**

The district court erred in failing to require Hearst to show that its internship program offered the "same kind of instruction" as a school. *Portland Terminal*, 330 U.S. at 153. Courts distinguish between defendants that provide actual training programs like the one in *Portland Terminal* and those that "merely . . . supervis[e] trainees as they carry out employees' duties." *Parker Fire*, 992 F.2d at 1028 (collecting cases). This distinction is critical because, without it, every employee who learned a new skill on the job could be labeled as a trainee. *Cf. Glatt*, 293 F.R.D. at 533 ("benefits" that are "incidental to working in the office like any other employee" are "not the academic or vocational training benefits envisioned" by *Portland Terminal*).

In *Donovan v. American Airlines, Inc.*, 686 F.2d 267 (5th Cir. 1982), the Fifth Circuit held that the training the airline provided was like the vocational training in *Portland Terminal*. *Id.* at 272. The training took place at a "Learning Center," was "conducted in an academic environment, and [wa]s virtually identical to the curriculum offered at vocational schools." *Id.* at 270. The trainees "were not productive for [the airline] until after their training end[ed]" and they did not

32

have contact with customers or replace or supplement the work of employees.  *Id.* at 269-70, 272.  Relying on these specific facts, the Fifth Circuit held that the trainees were not employees under *Portland Terminal*.  *Id.* at 271-73.

Similarly, in *Parker Fire*, the fire company's training "overlapped significantly" with what schools provided.  992 F.2d at 1027.  The curriculum included "classroom lectures, tours of the district, demonstrations, physical training, and simulations."  *Id.* at 1025.  Based on the training and that the prospective firefighters did not do any work, were not assigned to shifts, and did not maintain any equipment that was not training equipment, the Tenth Circuit held they were exempt trainees.  *Id.* at 1025, 1027-29.

By contrast, courts have held that plaintiffs whose "training" involves doing work under the supervision of regular employees, or simply working for the defendant's operations, are employees.  In *Ensley*, the Fourth Circuit held that trainee salesmen who learned how to perform their duties by assisting paid employees were employees.  877 F.2d at 1210.  In *Archie*, the court held that individuals who staffed the defendants' operations were employees because the defendants "structured a program that required the plaintiffs to do work that had a direct economic benefit[.]"  997 F. Supp. at 507.

33

## II. The District Court Improperly Adopted a Primary Beneficiary Test That Is Not Supported by *Portland Terminal*.

The district court erroneously held that *Portland Terminal* endorsed a balancing test that evaluated who was the primary beneficiary of the relationship. *See* SPA6. However, *Portland Terminal* did not weigh the benefits the trainees received against the benefits the railroads received at all. It explicitly relied on findings that the training program served "*only*" the trainees' "own interest" and that the railroads received "no 'immediate advantage' from any work done by the trainees." *Portland Terminal*, 330 U.S. at 152-53. *Portland Terminal* did not leave room for employers to benefit *at all* from the relationship and not pay the workers, and certainly did not invite courts to make FLSA coverage decisions by opining on who benefitted more from a work arrangement. *Portland Terminal* was based on circumstances where the benefits flowed only in one direction – to the trainees. *See id.* at 151-53 (trainees worked "solely for [their] personal purpose or pleasure;" training program provided "the same kind of instruction [as a vocational school] at a place and in a manner which would most greatly benefit[] the trainees").

### A. The Sixth Circuit's Standard Is Inconsistent with *Portland Terminal* and Should Not Be Followed.

The Court should not follow the Sixth Circuit's standard, set forth in *Solis v. Laurelbrook Sanitarium & School, Inc.*, 642 F.3d 518 (6th Cir. 2011), because it

34

substantially broadened *Portland Terminal*'s trainee exception and did not give

sufficient weight to key aspects of the Supreme Court's decision.

In *Laurelbrook*, the Sixth Circuit incorrectly held that *Portland Terminal*'s

principal focus was determining who was the primary beneficiary of the

relationship – the railroads or the trainees.  642 F.3d at 521, 525-31.  It held that an

employer can avoid paying the minimum wage if it can show that the benefits it

received were less substantial than the benefits that the trainees received.  *Id.* at

530-31.

However, the key question in *Portland Terminal* was whether the railroads

obtained *any* immediate advantage from the trainees – not whether they benefited

*more* than the trainees.  *See* 330 U.S. at 153.  By allowing employers to accept

some direct benefits as long as the trainees benefit more, the *Solis* test is much

more lenient than *Portland Terminal* requires and significantly reduces the burden

on employers seeking to accept free labor.

### B.    The Primary Beneficiary Test Is Unmanageable.

The Court should not adopt a primary beneficiary test because it is

unpredictable.  "[A]n employer could never know in advance whether it would be

required to pay its interns" because it would not know until after the internship

ended whether the intern was the primary beneficiary of the relationship.  *Glatt*,

293 F.R.D. at 532.

The test is also subjective and hard to apply.  In *Glatt*, the defendants "argued the very same internship position might be compensable as to one intern, who took little from the experience, and not compensable as to another, who learned a lot."  *Id.*  The primary beneficiary test is unlike the objective economic reality tests that this Court has adopted that provide employers with a clear set of criteria to make personnel decisions.  *See, e.g.*, *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988); *Zheng*, 355 F.3d at 71-72.

## C.    This Court Has Not Adopted the Primary Beneficiary Test.

The district court erroneously held that this Court adopted the primary beneficiary test in *Velez*, 693 F.3d 308.  SPA6.  In that case, the Court adopted a set of objective criteria to determine whether an individual providing childcare services in a home is covered by the FLSA's domestic worker protections.  *Velez*, 693 F.3d at 326, 330-31.  In reviewing the criteria that were relevant to that question, the Court noted that courts outside of this Circuit had applied a primary beneficiary test in trainee and student worker cases.  *Id.* at 330.  The Court did not determine that it is the appropriate test for interns.  *Id.*

To the extent that the Court found that an evaluation of benefits was relevant to domestic workers, it concluded that it was just one of several criteria courts should consider.  *Id.* (listing "the flow of benefits from the relationship" as one of six criteria).  This is consistent with the DOL's position that *one* of the relevant

36

criteria for unpaid internships is "whether the internship is for the benefit of the intern." *See* Part III.A, *infra*.

## III. This Court Should Adopt the Department of Labor's Six Criteria for Unpaid Internships.

The Court should adopt the DOL's six criteria for unpaid internships ("DOL Test"), which are set forth in U.S. Department of Labor Fact Sheet No. 71, Internship Programs Under the Fair Labor Standards Act (Apr. 10, 2010) ("Fact Sheet"), SPA14-15, because the criteria match the circumstances that were essential to the Supreme Court's decision in *Portland Terminal*, align with the FLSA's broad definition of "employee," and merit deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

### A. The DOL Test Incorporates the Criteria that Were Essential to the Supreme Court's Decision in *Portland Terminal*.

The Court should adopt all of the DOL criteria because the Supreme Court relied on each of them to find that the trainees were not employees in *Portland Terminal*. Under the DOL Test, "internships in the 'for-profit' private sector will most often be viewed as employment" because of the FLSA's "broad" definition of "employ," unless the following six criteria are met:

(1)  The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

(2)  The internship experience is for the benefit of the intern;

37

(3)     The intern does not displace regular employees, but works under close
        supervision of existing staff;

(4)     The employer that provides the training derives no immediate
        advantage from the activities of the intern; and on occasion its
        operations may actually be impeded;

(5)     The intern is not necessarily entitled to a job at the conclusion of the
        internship; and

(6)     The employer and the intern understand that the intern is not entitled
        to wages for the time spent in the internship.

SPA14-15.

The DOL Test criteria match the criteria that the Supreme Court relied on in
*Portland Terminal*: the railroads offered the same training as a vocational school,
330 U.S. at 152-53; the trainees worked "solely" for their own "personal purpose
or pleasure," *id.* at 152; the trainees did not displace regular employees, who
closely supervised them and did most of the work themselves, *id.* at 149-50; the
trainees "impede[d]," and did not "expedite the company business," and provided
the railroads with "no 'immediate advantage,'" *id.* at 153; the trainees were not
necessarily hired after completing the program, *id.* at 150; and the trainees did not
expect to be compensated for the training, *id.* at 150.

Nothing in *Portland Terminal* supports the district court's conclusion that an
employer can avoid paying its interns as long as it meets *some* of the DOL criteria.
*See* SPA6-7.  To the contrary, in *Portland Terminal*, the Supreme Court
emphasized that it was the lower court's "findings" that assured it that there had

38

not been a violation of "the letter or the spirit" of the FLSA and that the case would

not "open up a way for evasion of the law."  330 U.S. at 153.

### 1.  Requiring Each Criterion to Be Met Is More Consistent with the FLSA's Broad Coverage than a Balancing Test.

The DOL was correct to fashion a test that only allows an employer to take

advantage of a minimum wage exception where the employer can match each

significant fact in the Supreme Court case that created the exception.  Its approach

is consistent with the FLSA's expansive coverage of employees and ensures that

exceptions will be made only in circumstances like those in *Portland Terminal*.

For example, it would violate "the letter and spirit" of the FLSA to deny

coverage to a worker who produces productive work for an employer (SPA14

(Factor 4)), even if the work experience is very beneficial to the worker (SPA14

(Factor 2)).  Decoupling the requirements by balancing them against each other

would create a gaping hole in minimum wage coverage by allowing employers to

accept work from a wide range of entry-level workers who, because of their lack of

skill or experience, their economic vulnerability, or other circumstances, may

benefit more from their work than their employer gains from the fruits of their

labor.  This has never been the test for employment under the FLSA.  *See New

Floridian Hotel*, 676 F.2d at 471 n.3 (plaintiffs were employees even though they

performed their tasks so poorly that it produced little value); *Glatt*, 293 F.R.D. at

39

533 (interns were employees even if their work was "[m]enial" and could have been performed better or faster).  *Cf.* 29 C.F.R. § 520.300.

### 2.    The DOL Test Invites Courts to Consider Additional Circumstances Relevant to Employee Status.

The Court should not follow the Tenth Circuit, which generally approved the DOL Test criteria but refused to require the defendant to establish all of them, because its ruling was based on the erroneous assumption that the DOL Test precludes courts from considering circumstances beyond the six criteria.  *See Parker Fire*, 992 F.2d at 1027 (presuming that the criteria were "conclusive").  The DOL Test does not limit the circumstances that courts can consider.  Rather, it establishes the minimum requirements that an employer must meet to maintain an unpaid internship program.  The introductory language in the Fact Sheet makes clear that, subject to the presumption that interns at for-profit companies must be paid, courts may consider "all of the facts and circumstances of each [internship] program" in determining whether an employer has met its burden.  SPA14.

Thus, consistent with the DOL Test, this Court could adopt all six criteria and be open to considering additional criteria if it concludes that they are also relevant to the economic reality of an intern's employee status.

40

**B.     The DOL's Experience and Consistent Approach in Trainee and Intern Cases Warrant Deference to Its Intern Test.**

The DOL Test warrants deference because it "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140.  An agency's interpretation should be granted deference "given the specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (internal quotation marks and citation omitted).  The DOL has such "specialized experience," *id.*, and applied it in promulgating the test at issue here.

The weight to be accorded to an agency's interpretation also depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade[.]" *Skidmore*, 323 U.S. at 140.  Applying this standard, the Court should afford the DOL Test substantial weight.  It includes all of the outcome determinative factors in *Portland Terminal*.  *See* SPA14-15.  The DOL also thoroughly explained its reasoning for including each factor in the Fact Sheet. *Id*.

The DOL has applied its test in a consistent manner for decades.  The release of the Fact Sheet in April 2010 "did not represent a change in applicable law."

41

*Glatt*, 293 F.R.D. at 536. A version of the test, replacing the word "intern" for "trainee" and "internship" for "training period" "ha[s] appeared in Wage and Hour Administrator opinions since at least 1967." *Parker Fire*, 992 F.2d at 1026. In Opinion Letters in 1975, 1994, and 2004, for example, the DOL relied on the test to evaluate the employment status of unpaid interns and required each factor to be met.[10] *See* U.S. Dep't of Labor Op. Letter, 2004 WL 5303033, at *2 (May 17, 2004); U.S. Dep't of Labor Op. Letter, 1994 WL 1004761, at *1-2 (Mar. 25, 1994); U.S. Dep't of Labor Op. Letter, 1975 WL 40999, at *1 (Oct. 7, 1975).

Courts evaluating unpaid intern and trainee cases have long relied on the DOL Test and found it to be persuasive. *See Kaplan v. Code Blue Billing & Coding, Inc.*, 504 F. App'x 831, 834-5 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 618 (2013); *Atkins v. Gen. Motors Corp.*, 701 F.2d 1124, 1128 (5th Cir. 1983); *Glatt*, 293 F.R.D. at 532; *Ulrich v. Alaska Airlines, Inc.*, No. 07 Civ. 1215, 2009 WL 364056, at *3 (W.D. Wash. Feb. 9, 2009); *Archie*, 997 F. Supp. at 532-3. The fact that courts have accorded the DOL Test deference supports its persuasive power under *Skidmore*. *See* 323 U.S. at 139-40.

---

[10]    Although the Tenth Circuit opined that the DOL had not been consistent in requiring all of the factors to be met, it did not cite any interpretations or opinions involving trainees in which the DOL had taken a different approach. *See Parker Fire*, 992 F.2d at 1025-26. Instead, it cited introductory language requiring all of the circumstances of the trainee's activities on the employer's premises to be considered in assessing the six criteria. *See id.* at 1026-27. As discussed above, the test does not preclude courts from considering additional circumstances if they are relevant to the employer-employee relationship.

**IV.    The Court Should Grant Summary Judgment to Plaintiffs Because the Undisputed Evidence Establishes that They Were Employees.**

    **A.    Plaintiffs Were Employees, Not Trainees, Under *Portland Terminal*.**

Plaintiffs were not at all like the trainees in *Portland Terminal*.  Plaintiffs' internships were not similar to the weeklong training course in which the *Portland Terminal* trainees participated.  330 U.S. at 149-50.  Plaintiffs worked full-day schedules for several months as part of Hearst's regular operations.  *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 300-301 (1985) ("volunteers" who worked for defendant's businesses for "long periods" were "a far cry from [the trainees] in [*Portland Terminal*]"); *Glatt*, 293 F.R.D. at 534 (interns who "worked as paid employees work, providing an immediate advantage to their employer and performing low-level tasks not requiring specialized training" were employees, not trainees); *Archie*, 997 F. Supp. at 507, 533.

Hearst also did not provide "the same kind of instruction [as a vocational school] at a place and in a manner which would most greatly benefit" Plaintiffs.  *Portland Terminal*, 330 U.S. at 153.  Plaintiffs simply worked like Hearst's other employees at the place and in the manner that Hearst required.  *See* Statement of Facts ("SOF"), *supra*, at 13-19.  *See Alladin v. Paramount Mgmt., LLC*, No. 12 Civ. 4309, 2013 WL 4526002, at *3 (S.D.N.Y. Aug. 27, 2013) (intern was an employee where there was "no evidence . . . that [she] received training or

43

education beyond any on-the-job training given to employees"); *Glatt*, 293 F.R.D. at 532-33 (interns who learned by performing the same tasks as paid employees, and not because their internships were "engineered to be more educational than a paid position," were employees); *Okoro*, 2012 WL 1410025, at *10 (doing work for the defendant's operations was "not akin to the 'course of practical training,' which the prospective yard brakemen in [*Portland Terminal*] received") (quoting *Portland Terminal*, 330 U.S. at 150); *Archie*, 997 F. Supp. at 507-08 (program structured around the defendants' operations in which the plaintiffs did work was not a training course under *Portland Terminal*).

Furthermore, unlike the railroad trainees in *Portland Terminal*, Plaintiffs' work expedited Hearst's operations and did not impede them. *See* 330 U.S. at 149-50. Hearst admits that all of the Plaintiffs regularly performed productive work, including maintaining Hearst's "closets;" packing and unpacking clothes; accessories, and products; going on errands; doing administrative and editorial tasks; and staffing events. Unlike the supervisors in *Portland Terminal*, Plaintiffs' supervisors did not do "most of the work [they assigned to Plaintiffs] themselves," or "stand immediately by to supervise whatever [Plaintiffs] d[id]." 330 U.S. at 150. Plaintiffs did the work they were assigned themselves.

In fact, Plaintiffs' supervisors admitted that their work facilitated Hearst's operations. Wang's supervisor acknowledged that interns helped his department

44

run smoothly and saved him from doing their work himself.  SOF, *supra*, at 14.

Skorka's supervisor told her that she was doing the work of a paid Hearst assistant,

and tried to recruit her to perform the same duties as a paid consultant after her

internship ended.  *Id.* at 16.  A supervisor in Mancini's department testified that

interns made it easier for her and other Hearst employees to do their jobs.  *Id.* at

14.

Critically, in *Portland Terminal*, the railroad trainees provided "no

'immediate advantage'" to the company.  330 U.S. at 153.  Here, there is no

dispute that Plaintiffs' work provided an immediate advantage to Hearst.  *See*

*Ensley*, 877 F.2d at 1210; *Glatt*, 293 F.R.D. at 533; *Okoro*, 2012 WL 1410025, at

*10; *Archie*, 997 F. Supp. at 513-14, 533; *Marshall v. Baptist Hosp., Inc.*, 473 F.

Supp. 465, 472-73, 476 (M.D. Tenn. 1979), *rev'd on other grounds*, 668 F.2d 234

(6th Cir. 1981).  Plaintiffs' work did not "serve[] *only* [their] own interest."

*Portland Terminal*, 330 U.S. at 152.  It served Hearst's interests by reducing

Hearst's employees' workloads and eliminating work that Hearst would have had

to hire paid workers to do.  *See* SOF, *supra*, at 11-12.

45

**B.    Hearst Cannot Meet Four of the Six DOL Criteria as a Matter of Law.**

**1.    Plaintiffs Did Not Receive Training Similar to Training Provided in an Educational Environment.**

Hearst cannot meet the first DOL criterion because Plaintiffs did not receive training approximating the education they would receive in an educational environment.  *See* SPA14-15; *Glatt*, 293 F.R.D. at 531; *Archie*; 997 F. Supp. at 531.  Plaintiffs received almost no formal training and Hearst did not budget for any.  *See* SOF, *supra*, at 13-19, 22-23.  "The more that an internship program is structured around a classroom or academic experience as opposed to the employer's actual operations, the more likely the internship will be viewed as an extension of the individual's educational experience."  *See* Fact Sheet; *Portland Terminal*, 130 U.S. at 153 (railroads provided "the same kind of instruction" as a vocational school); *Am. Airlines*, 686 F. 2d at 270 (training was "conducted in an academic environment, and [wa]s virtually identical to the curriculum offered at vocational schools"); *Parker Fire*, 992 F.2d at 1025, 1027-28 (training "overlapped significantly with what would be taught in any firefighting academy").  Here, Plaintiffs' internships were almost entirely structured around Hearst's actual operations and involved on-the-job, not educational, training.

It is also undisputed that almost all of the instruction Plaintiffs received was on the job and related to their assigned duties.  *See* SOF, *supra*, at 13-19.  The fact

46

that Plaintiffs gained skills "simply by being there, just as [their] paid co-workers did, and not because [their] internship[s] [were] engineered to be more educational than a paid position" is insufficient to meet the first DOL criterion. *Glatt*, 293 F.R.D. at 532-33; *see Parker Fire*, 992 F.2d at 1028 (*Portland Terminal* is not satisfied by the "mere[]" supervision of "trainees as they carry out employees' duties").

The district court incorrectly held that Plaintiffs received "*some* educational training," and that this was sufficient to raise an issue of fact. SPA7. There was no evidence that Wang, Wagster, Skorka, Mancini, or Rappaport attended *any* classroom or other trainings that were designed to be educational during their internships. *See* SOF, *supra*, at 13-19. The only "training" they received was how to do their duties on the job. *Id*. This evidence weighs in Plaintiffs' favor, not in Hearst's favor, because on-the-job training in Hearst's operations is not "similar to training which would be given in an educational environment," but *is* similar to training that regular employees would receive. *See Ensley*, 877 F.2d at 1210; *Glatt*, 293 F.R.D. at 532-33; *Archie*, 997 F. Supp. at 507, 532-33.

The evidence of trainings to which the district court pointed – four sessions of "Cosmo-U" that Spencer and Wheels attended at which Hearst employees gave them career advice, and a "MediaMath" session that Lezsuk attended – are insufficient to raise an issue of fact with respect to these Plaintiffs. The career

47

advice sessions were not similar to training provided in an educational environment. *See Archie*, 997 F. Supp. at 533 (counseling and orientation providing "the most basic of job skills" do not qualify as "training that is similar to or even close to that which would be provided in a vocational school"). Even if the MediaMath training was educational, it is not sufficient to raise an issue of fact with respect to Lezsuk because it was so minimal. *See Portland Terminal*, 330 U.S. at 149, 153 (training lasted seven to eight days); *Am. Airlines*, 686 F.2d at 269-70, 272 (three to five week training); *Parker Fire*, 992 F.2d at 1025, 1027-28 (ten week training).

Substantial academic or vocational training, like the training courses in *Portland Terminal*, *American Airlines*, and *Parker Fire*, must be a prerequisite to establishing that an individual is a trainee because, without such a requirement, the entire basis for the Supreme Court's exception in *Portland Terminal* for "trainees" is meaningless. *See Parker Fire*, 992 F.2d at 1027-28; *Ensley*, 877 F.2d at 1210; *Glatt*, 293 F.R.D. at 532-33. The Supreme Court was aware of the risk that employers could take advantage of the trainee exception by expanding it beyond *bona fide* trainees and specifically cautioned against this in *Portland Terminal*. *See* 330 U.S. at 153.

## 2.    Hearst Did Not Design Plaintiffs' Internships to Benefit Them.

The benefits Plaintiffs received from their internships are insufficient as a matter of law.  Hearst did not design Plaintiffs' internships to benefit Plaintiffs. Any benefits that Plaintiffs received, such as how to do their assignments, resumé filler, career advice, and an understanding of how the magazines functioned, were incidental to working in an office like any other employee.  When "interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers) then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements[.]"  SPA15.

These types of benefits "result from any work relationship, paid or unpaid, and are not the academic or vocational training benefits envisioned by [the second DOL] factor."  *Glatt*, 293 F.R.D. at 533; *see Archie*, 997 F. Supp. at 507, 533 (benefits like job skills and employment history gained through work that has a direct economic benefit for the defendants are insufficient).

The district court incorrectly held that the parties disputed the benefits that Plaintiffs received, but the parties largely agreed.[11]  The parties disputed the legal

---

[11]    The factual disputes identified by the district court, *see* SPA4, 7, are immaterial, because none of the evidence cited by Hearst established that Plaintiffs

49

significance of the facts – whether the benefits supported trainee status.  The DOL and courts hold that benefits gained through productive work that any employee would receive are insufficient.  *See* SPA14-15; *Glatt*, 293 F.R.D. at 533; *Archie*, 997 F. Supp. at 507, 533.

### 3.    Plaintiffs Displaced Regular Employees and Were Supervised Like Regular Employees.

#### a.    The Evidence Establishes that Plaintiffs Displaced Regular Employees.

It is undisputed that the tasks that Plaintiffs performed were integral to Hearst's operations and would have been done by Hearst employees or other paid workers if Plaintiffs had not done them.  *See* SOF, *supra*, at 10-21.  If an employer "would have hired additional employees or required existing staff to work additional hours had interns not performed the work, then the interns will be viewed as employees and entitled to compensation under the FLSA."  SPA15; *compare Ensley*, 877 F.2d at 1210 (salesmen in training who aided employer's regular employees while they performed their duties were employees); *Glatt*, 293 F.R.D. at 533 (interns who performed "routine tasks that would otherwise have

---

obtained benefits sufficient to satisfy the second DOL criterion.  At best, the evidence shows that Plaintiffs had occasional networking opportunities, received some career advice, and learned while assisting with Hearst's day-to-day operations.  *See* A3355 (¶¶202-03, 205); A3367 (¶259); A3385 (¶347); A3375 (¶297); A5505-08 (¶¶D107-122); A3360-61 (¶232); A3360-61 (¶232); A3378 (¶313); A3389 (¶363); A5480 (¶D14); A5490-91 (¶¶D49, D53); A5492 (¶D57), A5500-01 (¶D87); A5508 (¶D120-21); A5511 (¶¶D134-35); A5519 (¶D164); A5520 (¶D168); A5523-24 (¶¶D178, D182-83); A5539 (¶D235); A5543 (¶D249).

been performed by" paid employees were employees); *Archie*, 997 F. Supp. at 533 (where program participants provided services that allowed defendants to avoid paying others at market rates, participants were employees, not trainees); *Baptist Hosp.*, 473 F. Supp. at 473 (trainees who "became functioning members of the . . . department . . . displaced regular employees"); *with Portland Terminal*, 330 U.S. at 152 (trainees did not displace regular employees "who d[id] most of the work themselves"); *Laurelbrook*, 642 F.3d at 531 (employer maintained sufficient staff so that "if the students did not perform work . . . the staff members could continue to provide the same services [] without interruption"); *Parker Fire*, 992 F.2d at 1029 (trainees "did not relieve any employed firefighter of his or her duties").

Here, the productive work that Plaintiffs performed would have required Hearst's employees to do the work themselves or hire paid workers to do it. Wang's supervisor admitted that his hours would have been "much longer" if interns did not do their work and agreed that interns were "vital" to keeping his department running smoothly. *See* SOF, *supra*, at 14. Wang, Spencer, Rappaport, Mancini, and Wagster went on errands that would have required paid couriers. *See id*. at 13-15, 17. Wang, Skorka, Wagster, Wheels, Rappaport, Mancini, and Lezsuk performed many of the same tasks as paid entry-level Hearst assistants. *See id*. at 13-19. Spencer's work organizing files, holding casting calls, assisting

51

at photo shoots, and updating contact lists is "work that otherwise would have been done by a paid employee." *Glatt*, 293 F.R.D. at 533.

### b. The Evidence Establishes that Plaintiffs Received the Same or Less Supervision than Regular Employees.

Plaintiffs did not work under "close supervision," *see* SPA14, and there is no dispute that their supervisors did not "stand immediately by to supervise whatever [Plaintiffs] d[id]." *Portland Terminal*, 330 U.S. at 150. "[I]f the intern receives the same level of supervision as the employer's regular workforce, this would suggest an employment relationship, rather than training." SPA15; *see Archie*, 997 F. Supp. at 516-17, 532 (plaintiffs did not receive "close supervision" where they were left to perform their tasks alone after receiving initial instruction); *Baptist Hosp.*, 473 F. Supp. at 472-74 (trainees who often worked unsupervised or were supervised by another trainee were "not closely supervised").

Here, at best, Plaintiffs received the same supervision as regular employees. Wang received instructions from her supervisor through email or verbally and then carried out the tasks she was assigned. A2029-30 (248:24-249:14). The feedback that Mancini received from her supervisor was that she was "doing a good job, [and] that [her supervisor] was happy with her performance." A4774-75 (155:19-156:8). Skorka's supervisor edited her work before it was posted on Redbook's website, explained her edits, and "sometimes" gave Skorka guidance on how to pick products for the magazine. A4879 (119:4-17); A4258 (111:23-112:10).

Wagster's supervisor told him how to fix something when he did something wrong, but "[t]hat was it."  A5087 (101:10-12).  Wheels was disappointed that her supervisor was "hands-off" and wished she had received more feedback during her internship.  A5287.

The district court held that fact disputes precluded summary judgment on this issue, SPA7, however, the parties largely agreed on the facts,[12] but disputed the legal significance of the facts.  The supervision that Plaintiffs received is not legally sufficient because it was not greater than what a regular employee might receive, *see* SPA15, and it was not the "close scrutiny" that the trainees in *Portland Terminal* received.  330 U.S. at 149.

### 4.    Plaintiffs' Work Provided an Immediate Advantage to Hearst and Did Not Impede its Operations.

Hearst does not dispute that Plaintiffs' productive work benefited it.  The DOL and courts have routinely held that productive work like the work that Plaintiffs performed, which the district court described in detail, provides an "immediate advantage."  SPA14 (interns who perform "productive work (for example, filing, performing other clerical work, or assisting customers)" do work that "benefits" the employer); *see Ensley*, 877 F.2d at 1210; *Glatt*, 293 F.R.D. at

---

[12]    The parties' disputes generally revolved around Hearst's attempt to characterize evidence that spoke for itself.  *See, e.g.*, A5504 (¶D105); A5518-19 (¶161).  Plaintiffs also disputed Hearst's use of testimony from individuals who lacked personal knowledge of Plaintiffs' work.  *See, e.g.*, A5499-500 ¶D85.

533; *Okoro*, 2012 WL 1410025, at *10; *Archie*, 997 F. Supp. at 513-14, 523-24,

535; *Baptist Hosp.*, 473 F. Supp. at 472-73.

The district court had no basis for finding that Plaintiffs caused Hearst

"*some* impediment" because Hearst did not submit any evidence supporting this.

*See* SPA7.  The general statements in Hearst's employee affidavits that staff spent

"significant time" supervising interns and that interns "occasionally" took them

away from other job responsibilities are insufficient to raise a question of fact with

respect to Plaintiffs because none of the affiants supervised Plaintiffs or claimed to

have personal knowledge about them.  *See, e.g.*, A5319 (¶7); A5304 ¶18.  *See* Fed.

R. Civ. P. 56(c)(4) (affidavit in opposition to summary judgment "must be made

on personal knowledge"); *see Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 n.5 (2d

Cir. 1998) (statements not based on affiant's personal knowledge are "insufficient

to defend against a motion for summary judgment").

### C.    The DOL Criteria Decidedly Weigh in Plaintiffs' Favor.

Even if the Court determines that Hearst is not required to meet each of the

DOL Test criteria, it should still grant summary judgment to Plaintiffs because the

first, second, third, and fourth criteria weigh in Plaintiffs' favor.  *See Glatt*, 293

F.R.D. at 532-34 (granting summary judgment to interns where four of the six

criteria favored them).

54

The Court should afford the last criterion – whether Plaintiffs understood they would not be paid – little weight.  It is well-established that the right to be paid under the FLSA cannot be waived, even knowingly, because "it would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate."[13]  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (internal quotation marks and citation omitted); *see also Alamo*, 471 U.S. at 302 ("the purposes of the Act require that it be applied even to those who would decline its protections"); *Glatt*, 293 F.R.D. at 534 (holding that the sixth criterion "adds little, because the FLSA does not allow employees to waive their entitlement to wages").

### D.   Under Hearst's Primary Beneficiary Test, Hearst Benefitted More than Plaintiffs.

Even under Hearst's primary beneficiary test, it was the primary beneficiary of the relationship, not Plaintiffs.  The benefits that Plaintiffs received were outweighed by the productive work that Hearst admits Plaintiffs regularly performed.  *See Ensley*, 877 F.2d at 1210 (plaintiffs who gained skills "specific to the job" and who provided "aid to [the defendant's] regular employees while they performed their normal duties" benefitted less than the defendant); *Wardlaw*, 339 F.2d at 787-88 (even if plaintiffs learned "enough [from their work] to enable them

---

[13]    Despite this clear precedent, the district court appears to have given this criterion more weight than the other criteria.  *See* SPA3.

55

to determine whether they would be interested in" careers in the defendant's field,
their work activities "served [the defendant's] interests" and did not fall under
*Portland Terminal*'s trainee exception); *Archie*, 997 F. Supp. at 535 (the benefit of
plaintiffs' productive work was greater than the basic job skills that the plaintiffs
gained).

**V.    The District Court's Denial of Class Certification Should Be Vacated
and Reconsidered in Light of the Appropriate Legal Standard.**

   **A.    The District Court Erred in Concluding that Plaintiffs Failed to
   Establish Commonality.**

The district court incorrectly held that Plaintiffs could not establish Rule
23(a)(2)'s commonality requirement because interns' duties and the specific
benefits they received varied.  SPA9.  Under the correct legal standard, however,
these variations are irrelevant.

   **1.    Plaintiffs Are Not Required to Show that All Interns
   Performed the Same Duties.**

The district court improperly held that Plaintiffs could not establish
commonality because interns' duties varied.  *Id.*  In reaching this conclusion, the
district court erroneously relied on FLSA overtime exemption cases where the
merits questions turn on the employees' particular duties.  *Id.* at 9-10.  These cases
are not "analogous" to this case, *see id.* at 9, because the correct legal standard asks
whether Hearst obtained "an immediate advantage" from its interns, which is not
dependent on interns showing what particular job duties they performed.  *See*

*Archie*, 997 F. Supp. at 535 (concluding that plaintiffs who performed different tasks in different departments were all employees because they "performed productive work for the defendants").

Here, the common evidence answers this key merits question. It is undisputed that interns across Hearst's magazines performed productive work. *See* SOF, *supra*, at 10, 20-21. Even though interns' specific tasks varied, the relevant nature of the work – that it provided an immediate benefit to Hearst – did not. This common proof was sufficient to satisfy Rule 23(a)(2)'s commonality requirement because it will "generate [a] common *answer*[] apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551, 2556 (emphasis in original) (internal citation and quotation marks omitted).

### 2.    Plaintiffs Are Not Required to Show that All Interns Received the Same Benefits.

The district court's finding that the benefits that interns received varied and that this variation precluded commonality should also be remanded in light of the correct legal standard. The evidence demonstrated that the benefits of Hearst's internship program fell short of the minimum level of benefits necessary to maintain an unpaid program because they are the types of benefits that "result from any work relationship, paid or unpaid, and are not the academic or vocational training benefits envisioned by" *Portland Terminal*. *Glatt*, 293 F.R.D. at 533.

Here, the interns obtained the types of benefits that result from a work relationship – office skills, professionalism and office etiquette, knowledge of how the magazines operate, contacts, career advice, and job references – rather than benefits obtained from a training program designed to be more educational than a regular job. *See* SOF, *supra*, at 22-23. These types of benefits are insufficient as a matter of law. At the very least, the evidence raises the common legal question of what benefits are sufficient. *See Glatt*, 293 F.R.D. at 533 (internship was not for the benefit of interns where the benefits "were incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them[]").

> **3.    The District Court Overlooked Common Evidence that Hearst's Internships Were Not Similar to Training in an Educational Environment.**

The district court overlooked another common issue that Plaintiffs raised: whether Hearst could show that its internship program provided training that is similar to training which would be given in an educational environment. *See Portland Terminal*, 330 U.S. at 152-53; *Glatt*, 293 F.R.D. at 532. Hearst cannot satisfy this requirement for any intern because there is no evidence that interns received more than *de minimis* academic-type training. *See* SOF, *supra*, at 22-23. This evidence was "apt to drive" the merits, *Wal-Mart*, 131 S. Ct. at 2551, because a key question is whether Hearst "structure[d] a training program as that concept is

58

understood in case law and regulatory interpretations [or] instead structured a program that required the plaintiffs to do work that had a direct economic benefit[.]" *Archie*, 997 F. Supp. at 507.

### 4. This Case Is Not Similar to *Wal-Mart Stores v. Dukes*.

The district court incorrectly equated Hearst's official unpaid internship policy to the unofficial subjective decision-making "policy" that the Supreme Court held failed to satisfy commonality in *Wal-Mart*, 131 S. Ct. at 2554-56.  In *Wal-Mart*, a proposed class of over 1.5 million members claimed that *Wal-Mart*'s policy of delegating authority to individual supervisors to make promotion decisions violated Title VII of the Civil Rights Act.  *See id*.  The Supreme Court held that the policy did not satisfy Rule 23(a)(2) because the plaintiffs had failed to offer evidence that supervisors exercised their discretion in a similar manner.  *Id*. at 2554-55.  Absent that evidence, the plaintiffs would not be able to prove discriminatory intent, a required element of their disparate treatment claim, on a classwide basis.  *See id*. at 2555-56.

Even setting aside the other significant distinctions between *Wal-Mart* and this case, critically, the evidence here *does* show that Hearst's employees acted in a consistent manner.  They (1) structured internships around Hearst's regular operational needs, not around formal educational or vocational settings; (2) provided interns with benefits that were work-related, not educational, including

teaching them how to do their assignments, giving them career advice, and providing them with job references; and (3) assigned interns to do productive work on a regular basis.  *See* SOF, *supra*, at 10-22.

### B.    The District Court Erred in Concluding that Plaintiffs Failed to Establish Predominance and Superiority.

#### 1.    Plaintiffs Raised Common Legal Issues that Predominate Over Any Individual Issues.

The district court's finding that Plaintiffs failed to satisfy predominance under Rule 23(b)(3) should also be reversed because the issues that are capable of being answered with common proof are far more substantial than other issues. "Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'"  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (emphasis and alterations in original) (citation omitted); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547-49 (2d Cir. 2010) (predominance is satisfied where some classwide merits issues are "more substantial" than other issues) (citations omitted).  Whether Hearst obtained an immediate advantage, structured internships to benefit interns, and provided educational training are decisive to the merits, and therefore, predominate over differences among interns, including the specific tasks they performed and the benefits they received, because the differences are less significant (if they are significant at all) to the merits.

60

### 2. Classwide Evidence Is Not Limited to Evidence Contained in Corporate-Level Documents.

The district court's conclusion that Plaintiffs' evidence was too "individualized" is incorrect. SPA11. The district court presumed that the evidence could not be used to determine the merits because it came from multiple sources, including deposition testimony, intern and employee job descriptions, and other documents, rather than consisting of an "Official[] Code of Conduct[,]" a "standardized company-wide description of responsibilities[,]" or a comparable corporate-level document. *See* SPA12 (citations and internal quotation marks omitted).

However, courts consistently hold that testimonial evidence from a sampling of class members can be used to prove the merits in wage and hour cases, *see, e.g.*, *Reich v. S. New England Telecomms. Corp.*, 892 F. Supp. 389, 402-03 (D. Conn. 1995) *aff'd*, 121 F.3d 58 (2d Cir. 1997) (liability finding for 1500 employees based on representative testimony of 39 employees); and juries routinely rely on evidence that is not contained in corporate-level policy documents, but in witness testimony, e-mails, manuals, and other non-corporate-level documents, to make classwide liability findings in FLSA exemption cases, *see, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1276-80 (11th Cir. 2008) (upholding jury verdict for 1400 plaintiffs based on testimony from seven plaintiffs, management witnesses, manuals, emails, internal correspondence, and payroll budgets).

61

### 3.    *Comcast v. Behrend* **Is Not a Bar to Predominance.**

The district court incorrectly held that the Supreme Court's decision in

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013), precluded Plaintiffs from establishing

predominance.  *See* SPA12.  The issues in *Comcast* that led the Supreme Court to

find that predominance was not met are not present here.  In *Comcast*, an antitrust

case, the plaintiffs were unable to put forth a way of measuring the class's damages

if they prevailed on their theory of liability.  *Comcast*, 133 S. Ct. at 1433-35.  As a

result, the plaintiffs could not "possibly establish that damages [we]re susceptible

of measure across the entire class for purposes of Rule 23(b)(3)."  *Id*. at 1433.

This case is not like *Comcast*.  It is a simple wage and hour case where the

calculation of damages is a "purely mechanical process," *Parra v. Bashas', Inc.*,

291 F.R.D. 360, 393 (D. Ariz. 2013), that is well-established through statute and

regulation, *see, e.g.,* 29 U.S.C. § 206(a); 29 C.F.R. § 778.107.  Unlike in *Comcast*,

the damages all stem from a single theory of liability – that Hearst misclassified

the class as non-employees and failed to pay them minimum wages and overtime.

*See Enea v. Bloomberg, L.P.*, No. 12 Civ. 4656, 2014 WL 1044027, at *7

(S.D.N.Y. Mar. 17, 2014) ("Unlike in *Comcast,* Plaintiffs' proposed measure of

damages is directly linked with their theory of liability under NYLL for

uncompensated overtime.")

Moreover, after *Comcast*, the majority of Circuit Courts have affirmed that the fact that class members are owed different amounts of damages is not a bar to a finding of predominance.  *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014).  *But see Halvorson v. Auto-Owners Ins. Co*., 718 F.3d 773, 777 (8th Cir. 2013).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) reverse the district court's order denying Plaintiffs' motion for summary judgment and hold that Plaintiffs were employees under the FLSA and NYLL; and (2) reverse the district court's denial of class certification and remand the issue for reconsideration in light of the correct legal standards.

Dated:        March 28, 2014

Respectfully submitted,

 */s/ Rachel Bien*

Rachel Bien
Adam T. Klein
Juno Turner
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  212-245-1000

*Attorneys for Plaintiffs-Appellants*

63

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,928 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: March 28, 2014

Respectfully submitted,

*/s/ Rachel Bien*
Rachel Bien

# SPECIAL APPENDIX
## TABLE OF CONTENTS

PAGE

Opinion and Order of the Hon. Harold Baer, Jr., Re: Plaintiffs'
    Motion for Partial Summary Judgment and Motion To
    Certify Class Pursuant to Fed. R. Civ. P. 23,
    dated May 8, 2013 ...................................................................SPA-1

United States Department of Labor, Wage and Hour Division:
Fact Sheet #71: Internship Programs Under The Fair Labor
    Standards Act (April 2010) ................................................SPA-14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

XUEDAN WANG, on behalf of herself and all          :
others similarly situated,                         :
                                                   :
                        Plaintiff,                 :
                                                   :        12 CV 793 (HB)
    - against -                                    :
                                                   :        OPINION & ORDER
THE HEARST CORPORATION,                            :
                                                   :
                        Defendant.                 :
------------------------------------------------------------x

Hon. HAROLD BAER, JR., District Judge:

     Before the Court are Plaintiffs' motions for partial summary judgment under Fed. R. Civ.

P. 56(a) and class certification pursuant to Fed. R. Civ. P. 23(a) and b(3).  Plaintiffs previously

interned at various magazines owned by Defendant Hearst Corporation ("Defendant") without

pay.  Plaintiffs allege that Defendant violated the minimum wage requirements, overtime

provisions, and recordkeeping requirements in the Fair Labor Standards Act ("FLSA"), 29

U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL") Art. 19 §§ 650 *et seq.*, and seek

the certification of the following class for their claims under the NYLL: "All persons who have

worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the

date of final judgment in this matter."  For the reasons set forth below, Plaintiffs' motions for

partial summary judgment and class certification are DENIED.

<b>Background[1]</b>

     Hearst is one of the world's largest publishers of monthly magazines with 20 U.S.

magazine titles and several corporate departments. Pls.' 56.1 ¶¶ 1, 5, 6.  Hearst is also an

"employer" under the FLSA and NYLL and in addition, has had more than 3,000 interns over the

past six years. Pls.' 56.1 ¶¶ 3, 17.  The background is applicable to both motions, summary

judgment and class certification.

     Since 2008, Hearst worked to reduce costs by decreasing its headcount and expenses at

the magazines as a response to the recession, and internal emails within Harper's Bazaar and

Marie Claire instructed the staff to use interns rather than paid messengers to save costs. Pls.'

------------------------

[1] Facts laid out in this section are not disputed between the parties, unless noted otherwise.

56.1 ¶¶ 100, 104, 110.  Discovery revealed that in 2008, 229 full-time employees were eliminated: 109 left due to the closure of three magazines; another 88 positions that were eliminated were middle to senior level employees; and 32 positions were entry-level. Def.'s 56.1 ¶¶ D274-8.

Hearst's Human Resources Department is charged with making sure that the company's magazines and departments are in compliance with wage and hour laws, and a part of its mission was to instruct all concerned to have the interns provide "school credit letters."  Pls.' 56.1 ¶¶ 41, 66.  The primary criteria relied upon by Hearst in concluding not to pay the interns was that for the most part, they were in college and eligible to receive academic credit. Pls.' 56.1 ¶ 70.  This policy has been in place at least since 2006. Pls.' 56.1 ¶ 73.  For the most part, all magazines followed this policy.  To provide some flavor, I describe below what some interns did during their internship.

Named Plaintiff Xuedan Wang worked as an intern five days a week, sometimes from 9 a.m. to 8 p.m., at the accessories department of Harper's Bazaar Magazine from August 2011 to December 2011. Pls.' 56.1 ¶¶ 7, 117, 198.  Wang's duties included serving as a contact between editors and public relations representatives, doing online research, cataloguing samples, maintaining the accessories closet, and doing story boards. Pls.' 56.1 ¶ 164.

Named Plaintiff Erin Spencer and Opt-in Plaintiff Sarah Wheels were interns at Cosmopolitan Magazine, the former from June 1, 2010 to August 15, 2010, and the latter from May 20, 2011 to August 10, 2011. Pls.' 56.1 ¶¶ 8, 14.  Spencer, as a bookings intern, worked four days per week from 9 a.m. to 5 or 5:30 p.m., and her duties included organizing files, holding casting calls, assisting at photo shoots, running errands, mailing magazine pages where models appear to models' agents, updating contact lists, and assisting in the fashion closet. Pls.' 56.1 ¶¶ 216, 222, 223, 231.  Wheels, as an editorial intern, worked four days a week from 9:15 a.m. to 6 p.m., and her duties included responding to emails from readers, researching for articles, surveying people on the street, transcribing interviews, compiling sales statistics, locating articles in the magazine's archive, writing content, and fact-checking articles. Pls.' 56.1 ¶¶ 365, 358.

Opt-in Plaintiffs Elizabeth Mancini and Caitlin Leszuk were interns at Marie Claire Magazine, the former from January 2009 through June 2009 and the latter from January 11, 2010 to May 15, 2010. Pls.' 56.1 ¶¶ 9, 12; Def.'s 56.1 ¶¶ 9, 12.  As a fashion intern, Mancini worked



three to four days a week and arrived between 8:30 and 9 a.m. and left some time after 6 p.m.,
and her duties included receiving clothing ordered from photo shoots, unpacking the items and
checking to make sure that everything ordered was received and not broken, photographing the
items, filing invoices, and putting the items on garment racks. Pls.' 56.1 ¶¶ 242, 270, 272.
Leszuk, as a sales intern, worked four days a week, from 9 a.m. to 6 p.m., and she spent the
majority of her time creating "edit credit" spreadsheets, which involved a line-by-line review of
Marie Claire and its competitors' magazines. Pls.' 56.1 ¶¶ 316, 323, 330.

Opt-in Plaintiff Matthew Wagster was an intern at Esquire from July 2009 to December
2009, where he worked three days a week from 9 a.m. to 6 p.m. Pls.' 56.1 ¶¶ 10, 314. As an
intern in the publishing department, he ran errands, updated guest lists for events, helped prepare
for events, and worked at the doors at the events. Pls.' 56.1 ¶ 305.

Opt-in Plaintiff Stephanie Skorka was an intern at Redbook from September 2009 to
December 2009. Pls.' 56.1 ¶ 11. As a beauty intern, Skorka worked three days a week from 10
a.m. to 6 or 7 p.m., and her duties included managing the beauty closet, assisting with photo
shoots, coming up with beauty story ideas, writing posts for the website, attending beauty
product launches, contacting public relation firms, and selecting beauty products for potential
inclusion in the magazine. Pls.' 56.1 ¶¶ 280-282, 290.

Opt-in Plaintiff Alexandra Rappaport was an intern at Seventeen from May 23, 2011 to
July 26, 2011. Pls.' 56.1 ¶ 13. As an intern in the fashion closet, Rappaport worked four days a
week, from 9:20 a.m. to between 6:30 and 7:30 p.m., and her duties included organizing clothes,
hanging them on racks, packing them, picking up and returning clothing, organizing jewelry,
sending packages, copying, faxing, and responding to emails from designers. Pls.' 56.1 ¶¶ 348,
351.

Some interns, e.g. Spencer and Wheels, attended four, one-hour sessions of "Cosmo-U"
during which the editors at Cosmopolitan talked about their careers. Pls.' 56.1 ¶¶ 232, 363.
Leszuk received at least one MediaMath class. Def.'s 56.1 ¶ D27. More importantly, all
Plaintiffs understood prior to their internship that the position was unpaid, Def.'s 56.1 ¶¶ D1,
D36, D92, D151, D192, D219, D245, and Hearst made it clear that there was little likelihood,
and certainly no guarantee, of a job at the end of their internship, Def.'s 56.1 ¶¶ D2, D37, D93,
D152, D193, D220, D246. The parties do not dispute that some of the duties performed by
Plaintiffs were performed by paid employees. See Pls.' 56.1 ¶¶ 157, 286, 312, 327, 349.

3

However, the parties dispute the amount of supervision provided, Def.'s 56.1 ¶¶ D12-14, D48, D85, D105, D114-116, D161, D201, D225, D254-256, as well as the benefits received and the advantages that Hearst derived, Def.'s 56.1 ¶¶ D20-25, D29, D53-59, D75-77, D121-2, D170-3, D187, D202-204, D228-230, D249-251, D260.

Discussion

### A. Motion for Partial Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact, and all reasonable inferences must be drawn in the non-movant's favor. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). A material fact is one that "might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation and quotation omitted).

### 1. Applicable Legal Standard

Plaintiffs move for partial summary judgment contending that they were "employees" under the FLSA and NYLL.[2] The FLSA[3] defines "employee" as "any individual employed by an employer" and the term "employ" is defined broadly to include "to suffer or permit to work." 29 U.S.C. § 203(e)(1), (g); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003). Although the term "intern" is neither defined nor provided as an exception in the FLSA, the parties do not dispute, and the Court agrees, that for this lawsuit, the Supreme Court in *Walling v. Portland Terminal Co.* 330 U.S. 148 (1947) provides, for the most part, the governing case law. In *Walling*, the Supreme Court found that trainees who worked for seven or eight days for the defendant railroad without pay during "a course of practical training" were not "employees" under the FLSA based on "the unchallenged findings [] that the railroads receive no 'immediate advantage' from any work done by the trainees." 330 U.S. at 153. The Court reasoned that "[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as

---

[2] Although Plaintiffs also moved for partial summary judgment with respect to Defendant's willfulness and Plaintiffs' entitlement to liquidated damages, the Court denied that portion of the motion from the bench after the oral argument on April 16, 2013. *See* ECF No. 143.

[3] The courts in this circuit have held that the NYLL "embodies the same standard for employment as the FLSA." *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012). The parties' briefs accordingly focused on the FLSA, Pls.' Supp. 24; Def.'s Opp. 26, and the analysis below is based on the FLSA but is applicable to the NYLL.

employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152.

The Department of Labor ("DOL") published a fact sheet in April 2010, which puts some meat on the *Walling* bones. U.S. Dep't of Labor, "Fact Sheet # 71: Internship Programs Under The Fair Labor Standards Act," available at http://www.dol.gov/whd/regs/compliance/ whdfs71.pdf ("DOL Fact Sheet #71"). In order to overcome the employment label, the internship, according to the DOL, must meet all of the following six factors:

> (1) The internship, even though it includes actual operation of the facilities of the
> employer, is similar to training which would be given in an educational environment;
> (2) The internship experience is for the benefit of the intern;
> (3) The intern does not displace regular employees, but works under close supervision of
> existing staff;
> (4) The employer that provides the training derives no immediate advantage from the
> activities of the intern; and on occasion its operations may actually be impeded;
> (5) The intern is not necessarily entitled to a job at the conclusion of the internship; and
> (6) The employer and the intern understand that the intern is not entitled to wages for the
> time spent in the internship.

While the weight to be given to these factors is far from crystal clear, the Fact Sheet adds to the confusion with the introductory language: "whether an internship or training program meets this exclusion depends upon all of the facts and circumstances of each such program." *Id.*

Not surprisingly, the parties disagree as to the appropriate test for defining an "employee" under *Walling*. Plaintiffs urge the Court to adopt a standard of "immediate advantage," contending that the outcome in *Walling* "would have been different if the railroads had obtained an immediate advantage from the trainees . . . . When an employer obtains a direct or immediate benefit from work, if has 'suffered or permitted' work and must compensate for it." Pls.' Supp. 26. In the alternative, they argue that Hearst "must meet all of the factors" in the Department of Labor's ("DOL") six-factor test and that it has failed to do so. Pls.' Supp. 29. On the other hand, Hearst urges the Court to adopt a "balancing of the benefits test" which looks to the totality of circumstances to evaluate the "economic reality" of the relationship. Def.'s Opp. 28. As for the DOL's six-factor test, Hearst contends that no judicial deference is required and is critical of Plaintiffs' effort to apply it as "a rigid checklist." *Id.* at 31.

SPA-6

I agree with Hearst that the Supreme Court in *Walling* looked to the totality of circumstances of the training program to determine whether the plaintiffs were "employees" under the FLSA.  Although the Supreme Court held in *Walling* that the men in that case were not employees because the defendant railroads received "no immediate advantage" from the trainees, 330 U.S. at 153, it does not logically follow that the reverse is true, i.e. that the presence of an "immediate advantage" alone creates an employment relationship under the FLSA.  Moreover, Plaintiffs' reading of *Walling* as establishing the test for an employer-employee relationship solely based on "direct or immediate benefit" is misplaced.  There is no one-dimensional test; rather, the prevailing view is the totality of circumstances test. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985).  To make the cheese more binding, the Second Circuit in a decision only last year echoed that view when it wrote, "whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity," and specifically noted that a key consideration in the analysis depended on "who is the primary recipient of benefits from the relationship . . . ." *Velez v. Sanchez*, 693 F.3d 308, 326, 330 (2d Cir. 2012).

All that said, I am also of the mind that the six factors in Fact Sheet #71 ought not be disregarded; rather, it suggests a framework for an analysis of the employee-employer relationship.  After all, they emanate from the agency that administers the laws under which Plaintiffs brought this lawsuit.  This position finds support in *United States v. Mead Corp.*, where we read "[A]n agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information and given the value of uniformity in its administrative and judicial understandings of what a national law requires." 533 U.S. 218, 234 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  The cases in this district that have considered the six-factor test conclude that the Fact Sheet is "a reasonable application of the FLSA and . . . entitled to deference by this court." *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531 (S.D.N.Y. 1998) (Sotomayor, J.); *see also Brown v. New York City Dep't of Educ.,* No. 12 Civ. 35, 2012 WL 6186496, at *8 (S.D.N.Y. Dec. 12, 2012) (referring to DOL Fact Sheet #71, along with agency regulation, to distinguish between services provided to for-profit private sector employers and public agencies).[4]

---

[4] Although Defendants rely on a Sixth Circuit case that denied any deference on the ground that the test was too rigid, the same case still noted that "the six factors may be helpful in guiding that inquiry." *Solis v. Laurelbrook*

### 2. Dispute Regarding Material Facts

Plaintiffs seek partial summary judgment based on the "immediate advantage" standard, while Hearst bases its argument on the totality of circumstances standard. This alone creates a genuine issue of fact sufficient to deny summary judgment. Further, to the extent that Plaintiffs seek partial summary judgment based on the DOL six-factor test, that branch of the motion too must be denied. A genuine dispute and material issues of fact exists, at least with respect to the first, second, third, and fourth factors. This is not a winner-take-all test, and Hearst has shown with respect to each Plaintiff that there was *some* educational training, *some* benefit to individual interns, *some* supervision, and *some* impediment to Hearst's regular operations, etc., which, if viewed in the light most favorable to the non-moving party, as it must be, supports the view that a jury could return a verdict in Hearst's favor.

### B. Motion for Class Certification

Plaintiffs also move the Court to certify the following class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) for the claims under the NYLL: "All persons who have worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the date of final judgment in this matter." Pls.' Supp. 40. "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citation omitted). Under the threshold requirements of Rule 23(a), the party seeking class certification must show that: (1) the class is sufficiently numerous; (2) there are questions of law or fact common to the class; (3) the class representative has claims and defenses that are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Rule 23(b)(3) requires the court to examine whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior" to individual litigation. Fed. R. Civ. P. 23(b)(3). Here, the parties do not dispute, and I agree, that Plaintiffs meet three out of four requirements under Rule 23(a): numerosity, typicality, and adequacy. However, the parties disagree about whether commonality and predominance requirements are satisfied.

---

*Sanitarium & Sch., Inc.*, 642 F.3d 518, 525 (6th Cir. 2011); *see also Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1027 (10th Cir. 1993) ("We are satisfied that the six criteria are relevant but not conclusive . . . ."). There is also contrary persuasive authority at the circuit level; the Eleventh Circuit affords deference to the six-factor test. *Kaplan v. Code Blue Billing & Coding, Inc.*, No. 12-12011, 2013 WL 238120, at *2 (11th Cir. Jan. 22, 2013).

**1. Rule 23(a): Numerosity, Typicality, and Adequacy**

Numerosity is satisfied under the 40-member presumption adopted by the courts of this Circuit, *see Shahriar v. Smith & Wollensky Rest. Group, Inc.*, 659 F.3d 234, 252 (2d Cir. 2011), as there are more than 3,000 members of the proposed class, Bien Decl. ¶ 13. Typicality is also satisfied, since Plaintiffs, like the class they seek to represent, worked for Hearst as unpaid interns, and all of them are suing under the same legal theory that they were "employees" under the NYLL. *See Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) ("Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."). The adequacy requirement too is satisfied given the quality of the representation by Plaintiffs' counsel and Plaintiffs' participation in this action without any known conflicts. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (defining the adequacy requirement as "inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation") .

**2. Rule 23(a): Commonality**

Fed. R. Civ. P 23(a)(2) is satisfied when "there are questions of law or fact common to the class." The Supreme Court has recently held that the party seeking class certification must raise more than a litany of common questions; rather, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs point out that Hearst has a "centralized policy" of classifying all interns as unpaid, non-employees and propose five common questions "that will generate a common answer:" (1) whether Hearst derived an immediate advantage from the interns' work; (2) whether paid workers were displaced; (3) whether an educational experience was provided; (4) whether the members derived benefit; and (5) whether the economic reality of the relationship was one of employment. Pls.' Reply 16; Pls.' Supp. 42-45. According to Plaintiffs, the common proof would consist of testimony by select interns and supervisors, Hearst's job postings and evaluation forms, and intern manuals and guidelines from individual magazines. Pls.' Supp. 43.

Hearst responds that the right legal standard involves an examination of individual factors that generate no common class-wide answers, and as in *Dukes*, "'significant proof' of a general policy that resulted in a class-wide violation" is absent. Def.'s 35. The cornerstone of Hearst's argument is that its 20 magazines have "no uniform policies or practices among magazines prescribing what interns must do." *Id*.

Here, while a close question, the commonality requirement is not satisfied because Plaintiffs cannot show anything more than a uniform policy of unpaid internship. In *Dukes*, the Supreme Court noted that the plaintiff failed to provide evidence of a "general policy of discrimination" that would constitute "significant proof" abridging the gap between an individual and a class claim. 131 S. Ct. at 2554. The evidence of a corporate-wide policy of classifying the proposed class members as unpaid interns is insufficient, as that policy alone cannot answer the liability question, which turns on what the interns did and what benefits they received during their internship. Although Plaintiffs have raised many common questions, under *Dukes*, this Court must "consider dissimilarities . . . in order to determine (as Rule 23(a)(2) requires) whether there is even a single common question." 131 S. Ct. at 2556 (alterations and internal quotation marks omitted). The duties performed by Lead and Opt-In Plaintiffs—to say nothing of the variation within each magazine and corporate department—clearly suggest that internships varied greatly from magazine to magazine. As it is Plaintiffs' burden to demonstrate by preponderance of evidence that this litigation will "generate common *answers* apt to drive the resolution," 131 S. Ct. at 2551, the Court is required to appraise such dissimilarities in its commonality analysis. Plaintiffs' vague advice that the Court consider instead "the nature of the work that interns performed," Oral Arg. Tr. 11:8-13:1, eschews, rather than addresses, the glaring problem here, that the Court cannot resort to any common proof to determine the very "nature" of the interns' work.

Certainly, even after *Dukes*, courts of this district have routinely found commonality in analogous misclassification cases under the NYLL. *See Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 616 (S.D.N.Y. 2012) ("The weight of authority rejects the argument that *Dukes* bars certification in wage and hour cases.") (citing cases). However, those cases are very different. *Compare Meyer v. U.S. Tennis Ass'n*, No. 11 Civ. 6268, 2013 WL 1777556, at *6 (S.D.N.Y. Apr. 25, 2013) (finding commonality because the proposed class members "carry out their duties for the [defendant] pursuant to a uniform policy, uniform training, uniform job

description, and uniform procedures"), *and Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2013 WL 1137024, at *6 (S.D.N.Y. Mar. 20, 2013) (finding commonality not just based on "the uniform classification of [the plaintiffs as Assistant Store Managers ("ASM")]," but also "the uniform description of ASMs' duties"), *with White v. W. Beef Properties, Inc.*, No. 07 Civ. 2345, 2011 WL 6140512, at *5 (E.D.N.Y. Dec. 9, 2011) (denying commonality based on uniform classification alone based because the "evidence span[ned] nine different departments—Meat, Produce, Frozen, Fish, Grocery, Bakery, Deli, Dairy and Receiving—each of which has a distinct set of concerns and job duties"). The plaintiffs in *Meyer* and *Jacob* were able to show a company-wide policy regarding employee *duties* in addition to a company-wide policy regarding a certain employee classification, whereas here, as in *White*, there is nothing more than a corporate-wide policy of classifying the proposed class members as unpaid interns based on academic credit letters. To mix a metaphor, while half a loaf is better than none, Plaintiffs' argument here just doesn't cut the mustard.

**3. Rule 23(b)(3): Predominance and Superiority**

Having failed to show sufficient evidence to support commonality, Plaintiffs have an even higher hurdle in their effort to meet the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," and the courts are instructed to "take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation and internal quotation marks omitted). The Second Circuit instructs that requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). In an analogous misclassification case, the Second Circuit held that while the defendant's "blanket [overtime] exemption policy" regarding the proposed class members is "in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of the main concern in the predominance inquiry: the balance between individual and common issues." *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010). The Second Circuit reasoned that "[i]n possible contrast to a uniform corporate policy detailing employees' job duties, the fact of common exemption does not establish whether all plaintiffs were actually entitled to overtime

10

pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions." *Id.*

    As explained above, Plaintiffs fail to satisfy the predominance requirement because the record shows that there is no uniform policy among the magazines with respect to the contents of the internship, including interns' duties, their training, and supervision, such that the analysis of four out of six DOL factors would have to be individualized.  Plaintiffs argue that the Court should overlook such deficiency in the record because the Court can make a determination at the general level as to the nature of the interns' duties, as well as the benefits, training, and supervision that they received, and suggest that the Court do so based on the testimony of select interns and supervisors, various job postings and evaluation forms, and intern manuals and guidelines of individual magazines. Pls.' Reply 17-20.  Unfortunately, this is precisely the reason which, when examined closely, directly undermines the predominance prerequisites.  For instance, there is a myriad of internship postings, manuals, and guidelines that set out different duties and training for each magazine; indeed, this is so even for the specific department *within* a single magazine. *See, e.g.*, Bien Decl. Ex. 167 (Cosmopolitan Fashion Intern Guide); Ex. 177 (Elle Accessories Intern Survival Guide); Ex. 169 (Esquire Fashion Closet Guide); Ex. 55 (Harper's Bazaar Fashion Editorial Internship Guidelines); Ex. 205 (Harper's Bazaar Intern Guide); Ex. 93 (Marie Claire Fashion Intern Handbook); Ex. 201 (Redbook Magazine Fashion Closet Intern Guide); Ex. 196 (Town & Country Intern Guide); Ex. 72 (Seventeen Beauty Intern Guide); Ex. 219 (Cosmopolitan Beauty Internship); Ex. 219 (Good Housekeeping Beauty Internship); Ex. 222 (Harper's Bazaar Beauty Internship); Ex. 216 (Town & Country Beauty Internship); Ex. 63 (Seventeen Editorial Intern Manual); Ex. 198 (Esquire Interns: A Guidebook); Ex. 95 (Marie Claire Features Intern Handbook); Ex. 202 (Redbook Features Intern Handbook); Ex. 209 (Cosmopolitan Editorial Internship); Ex 230 (Country Living Editorial Internship); Ex. 231 (Elle Features Internship); Ex. 224 (Harper's Bazaar Features Internship); Ex. 234 (Marie Claire Editorial Internship); Ex. 240 (Woman's Day Editorial Internship); Ex. 94 (Bazaar Photo & Bookings Internship); Ex. 204 (Marie Claire Photo Intern Guide); Ex. 200 (Seventeen Photo Intern Manual); Ex. 257 (Cosmopolitan Bookings Intern); Ex. 258 (Seventeen Magazine Bookings Internship); Ex. 212 (Esquire Art Internship); Ex. 91 (Esquire Sales and Marketing Internship); Ex. 178 (Marie Claire Marketing Internship Overview and

SPA-12

Responsibilities); Ex. 247 (Hearst Communications Internship); Ex. 248 (Hearst Marketing Internship).

To make liability determinations, the Court would have to evaluate all of such individualized evidence, in addition to individualized testimony about the level of supervision and respective benefits, against the six factors suggested by the DOL. Because the content of the internships, which is the core of the dispute, cannot be evaluated based on common proof, individual issues clearly overwhelm the common ones here. This case is therefore different from the post-*Dukes* misclassification cases. *See Meyer*, 2013 WL 1777556, at *11-12 (finding predominance because the class members' "primary duties" are governed by "Official's Code of Conduct" and their experience varied "at the margins"); *Jacob*, 2013 WL 1137024, at *12-15 (finding predominance "given [the defendant's] uniform [] job description and consistent approach to training"). *See also White*, 2011 WL 6140512, at *5 (denying class certification because there is no "standardized company-wide description of responsibilities").

I further note that the above analysis on predominance does not even take into consideration any problems related to damages calculation. *See Comcast Corp.*, 133 S. Ct. at 1433 (holding that the Circuit Court erred in its predominance analysis by failing to consider whether "questions of individual damage calculations will inevitably overwhelm questions common to the class"). Although Plaintiffs argue that *Comcast* is limited to anti-trust cases, the majority opinion explicitly rejected that very proposition. *Id.* at 1433 ("This case [] turns on the straightforward application of class-certification principles . . . ."). Indeed, although one could certainly quibble with the significance of a grant, vacate, and remand ("GVR") order from the Supreme Court, one must pause at least for a moment when one sees that the Supreme Court, "in light of *Comcast*," has issued an order vacating and remanding a Seventh Circuit's decision affirming the district court's certification in an overtime misclassification case. *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013).

The superiority analysis involves a consideration of four nonexclusive factors: (1) the interest of the class members in controlling the litigation of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). While there is undeniable efficiency that stems from consolidating and concentrating the litigation of

similar claims, the individualized nature of proofs in this case signals that case management would be difficult, if not near impossible, and separate actions may be more appropriate. Furthermore, given that the predominance requirement cannot be satisfied, Rule 23(b)(3) remains an insurmountable barrier to Plaintiffs.

### Conclusion

I have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, Plaintiffs' motion for summary judgment regarding their status as "employees" under the FLSA and NYLL is DENIED. Plaintiffs' motion for class certification under the NYLL claims is also DENIED. The trial, which is scheduled to commence on May 28, 2013, is adjourned sine die. The Clerk of the Court is instructed to close the two motions (ECF No. 105 & 106) and remove them from my docket.

**SO ORDERED**
May **8** , 2013
**New York, New York**

Hon. Harold Baer, Jr.
U.S.D.J.

SPA-14



(April 2010)

## Fact Sheet #71:  Internship Programs Under The Fair Labor Standards Act

This fact sheet provides general information to help determine whether interns must be paid the minimum wage and overtime under the Fair Labor Standards Act for the services that they provide to "for-profit" private sector employers.

**Background**
The Fair Labor Standards Act (FLSA) defines the term "employ" very broadly as including to "suffer or permit to work."  Covered and non-exempt individuals who are "suffered or permitted" to work must be compensated under the law for the services they perform for an employer.  Internships in the "for-profit" private sector will most often be viewed as employment, unless the test described below relating to trainees is met.  Interns in the "for-profit" private sector who qualify as employees rather than trainees typically must be paid at least the minimum wage and overtime compensation for hours worked over forty in a workweek.[*]

**The Test For Unpaid Interns**
There are some circumstances under which individuals who participate in "for-profit" private sector internships or training programs may do so without compensation.  The Supreme Court has held that the term "suffer or permit to work" cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction.  This may apply to interns who receive training for their own educational benefit if the training meets certain criteria.  The determination of whether an internship or training program meets this exclusion depends upon all of the facts and circumstances of each such program.

The following six criteria must be applied when making this determination:

1.  The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2.  The internship experience is for the benefit of the intern;

3.  The intern does not displace regular employees, but works under close supervision of existing staff;

4.  The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5.  The intern is not necessarily entitled to a job at the conclusion of the internship; and

6.  The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

If all of the factors listed above are met, an employment relationship does not exist under the FLSA, and the Act's minimum wage and overtime provisions do not apply to the intern.  This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of "employ" is very broad.  Some of the most commonly discussed factors for "for-profit" private sector internship programs are considered below.

SPA-15

**Similar To An Education Environment And The Primary Beneficiary Of The Activity**
In general, the more an internship program is structured around a classroom or academic experience as opposed to the employer's actual operations, the more likely the internship will be viewed as an extension of the individual's educational experience (this often occurs where a college or university exercises oversight over the internship program and provides educational credit). The more the internship provides the individual with skills that can be used in multiple employment settings, as opposed to skills particular to one employer's operation, the more likely the intern would be viewed as receiving training. Under these circumstances the intern does not perform the routine work of the business on a regular and recurring basis, and the business is not dependent upon the work of the intern. On the other hand, if the interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements because the employer benefits from the interns' work.

**Displacement And Supervision Issues**
If an employer uses interns as substitutes for regular workers or to augment its existing workforce during specific time periods, these interns should be paid at least the minimum wage and overtime compensation for hours worked over forty in a workweek. If the employer would have hired additional employees or required existing staff to work additional hours had the interns not performed the work, then the interns will be viewed as employees and entitled compensation under the FLSA. Conversely, if the employer is providing job shadowing opportunities that allow an intern to learn certain functions under the close and constant supervision of regular employees, but the intern performs no or minimal work, the activity is more likely to be viewed as a bona fide education experience. On the other hand, if the intern receives the same level of supervision as the employer's regular workforce, this would suggest an employment relationship, rather than training.

**Job Entitlement**
The internship should be of a fixed duration, established prior to the outset of the internship. Further, unpaid internships generally should not be used by the employer as a trial period for individuals seeking employment at the conclusion of the internship period. If an intern is placed with the employer for a trial period with the expectation that he or she will then be hired on a permanent basis, that individual generally would be considered an employee under the FLSA.

**Where to Obtain Additional Information**
This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

**For additional information, visit our Wage and Hour Division Website: http://www.wagehour.dol.gov and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

**U.S. Department of Labor**                                                    **1-866-4-USWAGE**
Frances Perkins Building                                                    TTY: 1-866-487-9243
200 Constitution Avenue, NW                                                    **Contact Us**
Washington, DC 20210

---

\* The FLSA makes a special exception under certain circumstances for individuals who volunteer to perform services for a state or local government agency and for individuals who volunteer for humanitarian purposes for private non-profit food banks. WHD also recognizes an exception for individuals who volunteer their time, freely and without anticipation of compensation for religious, charitable, civic, or humanitarian purposes to non-profit organizations. Unpaid internships in the public sector and for non-profit charitable organizations, where the intern volunteers without expectation of compensation, are generally permissible. WHD is reviewing the need for additional guidance on internships in the public and non-profit sectors.